Receipt No. 067177

ORIGINAL

FILED
SEP 28 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| WEEKS MARINE, INC., | : | |
| Plaintiff, | : | |
| v. | : | No. 07-700 C |
| THE UNITED STATES, | : | |
| Defendant. | : | |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY JUDGMENT**

Plaintiff, WEEKS MARINE, INC., ("Weeks"), through its undersigned counsel, for its Complaint in the above-captioned matter, alleges as follows:

**NATURE OF ACTION**

1. This is a protest prior to submission of proposals challenging the propriety of the solicitation by negotiation of multiple award task order contracts for the performance of dredging and shore protection in the South Atlantic Division of the U.S. Army Corps of Engineers.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1491(b)(1) and (b)(2).

## PARTIES

3. Plaintiff, Weeks, an experienced dredging contractor, is a New Jersey corporation with its principal place of business located in Cranford, New Jersey, and with the headquarters of its Dredging Division located in Covington, Louisiana.

4. Defendant is the United States, acting through its agency, the U.S. Army Corps of Engineers ("Corps"), Jacksonville District.

## FACTUAL ALLEGATIONS

5. On June 4, 2007, the Defendant, acting through the Jacksonville District of the U.S. Army Corps of Engineers, issued a negotiated solicitation under the procedures set forth in FAR, Part 15, for regional indefinite delivery indefinite quantity ("IDIQ") multiple award task order contracts ("MATOC") for the performance of dredging and shore protection projects within the boundaries of the South Atlantic Division. Under the terms of the solicitation, as few as eight MATOC contracts may be awarded by the Corps.

6. An IDIQ contract provides the Government with the ability to order the supplies or services that it requires from a contractor in indefinite quantities, within stated limits, for a fixed period of time. (FAR 16.504(a)).

7. A MATOC contract is one of a group of IDIQ contracts awarded under a single master solicitation to a number of

contractors. The Government then has the ability to issue requests for task order proposals from the MATOC contractors. The MATOC contractors then compete to furnish the Government with the supplies or services it requires. (FAR 16.504).

8. The United States Census Bureau has adopted the North American Industry Classification System (NAICS) to identify and categorize industries in the United States. The NAICS defines dredging as part of the industry "Other Heavy and Civil Engineering Construction (237990)" within the industrial sector "Construction (23)."

9. The NAICS codes are used by Federal agencies to characterize the type of products or services that are being sought in a procurement. The solicitation in this matter stated that "the NAICS code for these projects is 237990."

10. Dredging of the navigable waters of the United States is a mission that is primarily accomplished by construction contracts awarded by the U.S. Army Corps of Engineers to various large and small business dredging contractors.

11. The dredging industry is a relatively small group of highly specialized contractors, most of which have competed for many years to perform the Defendant's dredging mission.

12. The distinctions between large and small business concerns, as well as between hopper and non-hopper dredging

contractors, have inherently led to "lines of demarcation" in the dredging community.

13. Emphasizing the small size of the dredging industry, in comparison to other sectors of the construction industry, is the recent contract award history in the South Atlantic Division. During the past two fiscal years, 2006 and 2007, the Corps has awarded forty-nine contracts in the southeastern United States to a total of thirteen different contractors, eight small businesses and five large businesses. In 2006, two-thirds of the sealed bid procurements had two or less bidders; while in 2007, three-fourths had three or more bidders.

14. The proposed MATOC procurement will limit competition for dredging projects to be performed within the jurisdiction of the South Atlantic Division to a small group of selected dredging contractors for a period of up to five years.

15. Historically, the vast majority of dredging contracts in the South Atlantic Division, and throughout the Corps of Engineers nationally, have been solicited through FAR, Part 14, sealed bidding procedures.

16. While the number of negotiated procurements of dredging by the Corps has increased recently, a review of the contract statistics maintained by the Corps' Navigation Data Center reveals that of the 216 dredging contracts issued by the Corps in the first six months of FY 2007, only 17 were RFP's, while 172

were IFB procurements. In FY 2006, the Corps issued 165 contracts, 17 from RFP's and 123 from IFB procurements. The predominant method of contracting for dredging is by sealed bid.

17. Under sealed bidding competition is limited to price, and price alone, and the lowest responsive and responsible bidder is awarded a contract.

18. The procurement of dredging through sealed bidding has served the Corps of Engineers well for many years, and it is a system that has fostered a spirited competitive environment where dredging contractors strive to win awards by submitting bids at the lowest possible prices.

19. The dredging industry is a well-established industry where the qualifications of the participating contractors are rarely at issue, making the procurement of dredging uniquely well-suited to procurement by sealed bidding.

20. In the unusual situation where the capability of a low bidder to perform a project is brought into question, the responsibility determination provided by FAR 9.104-1, "General Standards," authorizes the contracting officer to reject a bidder who is deemed to be non-responsible. To be found responsible, the bidder must, to the satisfaction of the contracting officer, demonstrate that it has the necessary financial resources, can timely perform, possesses a satisfactory performance record, and

has, or can obtain, the equipment, personnel, and other resources necessary to perform the work.

21. The two major types of dredging are "new work" dredging, which occurs in new channels or navigation projects that are being deepened and widened; and, "maintenance" dredging which occurs in existing channels to remove material that has been deposited since the channels were previously dredged. The projects included in the master MATOC contract include both types of dredging.

22. The reason that competition has successfully been limited to price competition for so many years is that both new work and maintenance dredging are rather straightforward and the technical approach of the competing contractors is not a matter that requires a technical evaluation.

23. The South Atlantic Division of the U.S. Army Corps of Engineers includes five districts; Wilmington, Charleston, Savannah, Jacksonville, and Mobile, and encompasses all of the harbors, navigable waterways, and beachfront in the states of North Carolina, South Carolina, Georgia, Florida, Alabama, and Mississippi, as well as the Commonwealth of Puerto Rico.

24. The solicitation listed 108 separate projects that were included in the scope of the procurement. These projects were divided into four groups. One group of 35 projects was designated as set-aside for small businesses. Another group of

16 projects were designated as requiring the use of U.S. Coast Guard certified hopper dredges. The remaining two groups, totaling 57 projects were unrestricted. The list of projects in the solicitation was essentially an inventory of all dredging and shore protection projects of the Federal government in the southeastern region of the United States.

25. The solicitation consisted of a base year and four option years. The solicitation included the performance of virtually all dredging and shore protection work for the Federal government for the next five years in the southeastern region of the United States.

26. The total maximum value of all of the contracts under this solicitation was $2,000,000,000, $500,000,000 per group. The solicitation indicated that each awardee was only guaranteed to receive the "contract minimum," and that "the minimum guarantee for each contract is $2,500 for the entire duration of the contract."

27. On June 8, 2007, the Corps held a Pre-Proposal Conference at which potential offerors raised many questions concerning the procurement. The Corps' response to most of the questions was that answers would require additional research before responses could be provided.

28. On June 19, 2007, the Corps issued Amendment No. 0001, extending the proposal due date from July 6, 2007 to July 25,

2007. The Corps also notified potential offerors that "the government intends to issue another amendment within the next 5 business days which will contain revisions and/or clarifications to the solicitation."

29. On June 20, 2007, the Corps issued answers to forty-six of the questions raised at the Pre-Proposal Conference. The Corps also furnished answers to thirty-nine additional questions that it had received after the Pre-Proposal Conference. The Corps further indicated that answers to some more questions were still being researched and that further answers would be provided "as quickly as possible."

30. On June 26, 2007, the Corps issued a 95 page amendment, No. 0002, to the solicitation. The amendment contained, among other changes, a revised pricing schedule, list of potential projects, instructions to offerors, and evaluation factors for award.

31. On July 2, 2007, the Corps issued a 180 page amendment to the solicitation, Amendment No. 0003. The Corps further revised the pricing schedule, contract award and task order procedures, instruction to offerors, and the evaluation factors for award. The due date for proposals remained July 25, 2007.

32. On July 13, 2007, the Corps issued Amendment No. 0004 temporarily postponing the due date for proposals.

33. On August 7, 2007, the Corps issued a 303 page Amendment, No. 0005, to the solicitation. The Corps changed many of the solicitation requirements and issued new sections concerning the pricing schedule, contract awards and task order procedures, list of potential projects, instructions to offerors, evaluation factors for award, and a number of the technical specifications sections. The due date for proposals was extended to September 7, 2007. Offerors were advised that plans and specifications for four individual projects were being issued which "will be used to evaluate price." Offerors, in order to be considered for an award of a basic MATOC, were required to submit pricing on at least one of these projects.

34. On August 8, 2007, the Corps issued four Task Order Solicitations and Specifications. These voluminous documents included the following projects:

Group 1 - Entrance Channel to Kings Bay, GA and Fernandina Harbor, FL

Group 2 - Intracoastal Waterway, Volusia County, FL

Group 3 - Captiva Island Beach Nourishment Project

Group 4 - U.S. Naval Station Mayport, FL

35. The Corps, on August 9, 2007, issued answers to an additional thirty-two questions that had been raised by potential offerors.

36. On August 17, 2007, the Corps issued Amendment No. 0006 containing some minor changes to the solicitation section "INSTRUCTIONS, CONDITIONS AND NOTICES TO OFFERORS." On August 31, 2007, the Corps issued Amendment No. 0007 extending the proposal due date to September 26, 2007.

37. The Corps issued Amendment No. 0008 on September 18, 2007. The proposal due date was changed to October 3, 2007. The amendment modified some of the task order procedures related to release of offeror's prices and the identification of potential non-price evaluation factors in the competition between MATOC contractors on future task orders.

38. Also, on September 18, 2007, the Corps provided responses to an additional fourteen questions that prospective offerors had submitted during the procurement.

39. On September 21, 2007, the Corps issued revised Task Order solicitations and specifications for the four projects that would be used to evaluate price in the selection of the MATOC contractors.

40. The Corps of Engineers informed offerors that it intended to evaluate proposals and award the MATOC contracts "without discussions with offerors."

41. The evaluation factors were listed separately for each of the four major groups in Section 00100B of the solicitation.

The factors were Technical Merit, Price, Past Performance, and Utilization of Small Business Concerns.

42. The solicitation listed different subfactors for the technical merit factor for each group. For Group 1, "Hopper Dredging Projects, the solicitation contained two technical merit subfactors; evidence that the offeror possesses hopper dredges and evidence of Coast Guard Certification of the hopper dredges.

43. For Group 2, "Small Business Set-aside Projects," the solicitation provided three technical merit subfactors; evidence that the offeror was a small business, evidence of the offeror's ability to provide acceptable performance and payment bonds, and evidence the offeror possesses a dredge (at least a 14" cutter suction, clamshell, pipeline/dustpan, or hopper dredge).

44. For Group 3, "Shoreline Protection Projects," the technical merit factor required evidence that an offeror possessed a dredge (at least a 14" cutter suction, a clamshell, a pipeline/dustpan, or a hopper dredge).

45. For Group 4, "Other Projects", as for Group 3, "Shoreline Protection Projects," the technical merit factor for each merely required evidence that an offeror possessed a dredge (at least a 14" cutter suction, a clamshell, a pipeline/dustpan, or a hopper dredge).

46. These so-called "technical merit" factors essentially only required the offeror to demonstrate that it actually

possessed the dredging equipment required to perform the projects, and that it complied with certain certification requirements.

47. All of these so-called "technical merit" factors are part of a routine pre-award responsibility determination as specified in FAR 9.104-1, "General Standards" utilized in the evaluation of sealed bids under FAR, Part 14.

48. None of these so-called "technical merit" factors address an offeror's technical approach or technical plan to perform the work.

49. The solicitation provided that "after eliminating any proposal that does not meet standards of acceptability for the technical merit factor, the Source Selection Authority will use a trade-off process (considering past performance, utilization of small business concerns, and price) to determine which offer(s) represent the best value to the Government."

50. In conducting the proposal evaluation, the Government indicated that it would employ the following methodology:

| ELEMENT | METHOD |
|---|---|
| Price | Price will not be given a score. . .Prices will be evaluated for reasonableness, realism, unbalanced pricing or any other price related issues. |

| | |
|---|---|
| Technical Merit | Will be evaluated for acceptability. Possible ratings are: Acceptable and Not Acceptable. In order to receive an acceptable rating for this factor, a proposal must be rated acceptable in every subfactor. |
| Past Performance | Will be evaluated for risks associated with the proposal. Possible ratings are: Very Low, Low, Moderate, Unknown, High, and Very High. |
| Utilization of Small Business Concerns | Will be evaluated for commitment to policy stated in FAR 51.219-8. Possible ratings are: Outstanding, Above Average, Satisfactory, Marginal, and Unsatisfactory. |

51. While cautioning offerors that "proposals will be evaluated for acceptability but will not be ranked by non-price factors," the Government informed offerors that:

> Past Performance is considered significantly more important than price. Utilization of Small Business Concerns is considered significantly less important than Past Performance and Price. All evaluation factors, when combined, are significantly more important than price.

52. After selecting and awarding MATOC contracts to at least two offerors in each Group, the Government intends to award the task order for each of the projects used to evaluate price to "the successful offeror." However, there will be, at a minimum, two successful offerors for each Group and neither the master MATOC solicitation nor the individual task order solicitations

issued as part of the master solicitation contain the evaluation criteria for the source selection of which successful offeror will be awarded the initial task orders.

53. The Government indicates that it intends to issue further requests for task order proposals to perform the projects listed in the MATOC solicitation in a sequence to be determined by the Government. The Government stated that it intends to select the task order proposal that "is most advantageous and responsive to the Government's needs." The Government stated that the evaluation factors and source selection procedure to be used for a particular task order would be issued as part of the request for task order proposal.

54. In its source selection decision on task orders, the Government indicates that "price or cost under each order shall be considered as one of the factors." In addition, the Government states that "the Government shall always consider past performance (including quality, timeliness and cost control), equipment availability, and equipment capability as evaluation factors." The Government further indicated that it "may also include any of the following as additional evaluation factors: (1) potential impact on other orders placed with the contractor, (2) minimum order requirements, and (3) urgency of need." The Government indicated that it would use either one of the two source selection processes provided in FAR 15.101, the tradeoff

process or the lowest price technically acceptable process, whichever it decides is appropriate for a particular task order.

55. When an agency is procuring construction, such as in this case, it is to comply with FAR Part 36, CONSTRUCTION AND ARCHITECT-ENGINEER CONTRACTS." Part 36 of the FAR provides that: "The contracting officer shall use sealed bid procedures for a construction contract if the conditions in 6.401(a) apply. . ." FAR 36.103(a).

56. Paragraph 6.401(a) of the FAR provides:

Contracting Officers shall solicit sealed bids if --

(1) Time permits the solicitation, submission, and evaluation of sealed bids;

(2) The award will be made on the basis of price and other price-related factors;

(3) It is not necessary to conduct discussions with the responding offerors about their bids; and

(4) There is a reasonable expectation of receiving more than one sealed bid.

57. None of the conditions that the FAR requires to authorize the use of the negotiated procurement process apply to this proposed MATOC procurement and the regulations therefore prohibit the issuance of the solicitation.

58. In addition, the purported evaluation of proposals to select the master MATOC contractors is nothing more than the pre-selection of already qualified dredging contractors for the

purpose of enabling the issuance of "best value" task orders where competition will not only include price, but also other subjective evaluation factors.

59. Moreover, the solicitation anticipates multiple awards of indefinite delivery contracts to a number of offerors to accomplish substantially all of the dredging and beach nourishment projects in the southeastern United States over the next five years. However, the agency's procurement regulations place substantial restrictions on the situations in which indefinite delivery contracts can be used.

60. The restrictions on the use of indefinite delivery contracts are clearly enunciated in the Corps' Engineer Federal Acquisition Regulation Supplement (EFARS), as follows:

> IDC [indefinite delivery contracts] may be used *only if* one or more of the following conditions applies-
>
> 1) The cost to procure the required services or supplies individually through normal selection procedures is uneconomical compared to the cost of the services or supplies themselves;
>
> 2) The time required to procure the required services or supplies individually through normal selection procedures will cause an unacceptable delay in fulfilling the requirements;
>
> 3) Technical continuity among related requirements is essential;
>
> 4) Significant cost savings in contract price and/or contract administration will accrue by having a single contractor perform several similar requirements; or
>
> 5) Management of more than one contractor on an installation presents unacceptable administration problems in such areas as coordination and movement of work forces and

equipment, separation and acceptance of contractor responsibility, and verification of performance and progress. (EFARS 16.501, S-103(a), emphasis in original.)

61. None of the conditions that the EFARS requires to authorize the use the IDIQ contracts apply to this proposed MATOC procurement and the regulations therefore prohibit the issuance of the solicitation.

## REQUEST FOR RELIEF

WHEREFORE, WEEKS MARINE, INC. respectfully requests that this Court enter an Order providing for:

1. A temporary restraining order preventing the United States from receiving proposals and proceeding with the solicitation.

2. A declaratory judgment that the solicitation can only proceed on the basis of sealed bidding as required by FAR 6.401 and FAR 36.103.

3. A preliminary and permanent injunction directing the Contracting Officer to proceed with the procurement using sealed bid procedures.

4. Such other relief as the Court deems just and proper under the circumstances of this case.

Respectfully submitted,

Date: 9-28-07

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777/215-542-2779(fax)

Attorney of Record for
WEEKS MARINE, INC.

Of Counsel:
Joseph A, Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC., | : | |
| Plaintiff, | : | |
| v. | : | No. |
| THE UNITED STATES, | : | |
| Defendant. | : | |

**CERTIFICATE REQUIRED BY RULE 65 OF THE RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS**

I, Michael H. Payne, the undersigned counsel of record for WEEKS MARINE, INC., certify that I hand-delivered or caused to be hand-delivered, two copies of the Complaint, Application for Temporary Restraining Order, Motion for Preliminary Injunction, and accompanying documents to Commercial Litigation Branch, Civil Division, U.S. Department of Justice, 1100 L Street, N.W., Room 12124, Washington, D.C. 20530, in accordance with Rule 65(f)(1) of the Rules of the United States Court of Federal Claims.

Respectfully submitted,

[signature]

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779 (fax)
mhp@phslegal.com

Attorney of Record for
WEEKS MARINE, INC.

Dated: 9-28-07

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC., | : | |
| Plaintiff, | : | |
| v. | : | No. |
| THE UNITED STATES, | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that copies of the Plaintiff's Complaint, Motion for Temporary Restraining Order, Preliminary Injunction, Memorandum of Points of Authorities in Support of Plaintiff's Motion, and the Certificate Required by Rule 65 were served by messenger on Sept. 28, 2007 upon:

U.S. Department of Justice
Commercial Litigation Branch
Civil Division, 8th Fl.
Attn: Classification Unit
1100 "L" Street, N.W. Rm 10112
Washington, DC 20005

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779 (fax)
mhp@phslegal.com

Attorney of Record for
WEEKS MARINE, INC.