IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| WEEKS MARINE, INC. | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | No. 07-700C |
| | : | (Judge Wheeler) |
| THE UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| | : | |

**PLAINTIFF'S REPLYTO THE DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S REPLY AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779(fax)
mhp@phslegal.com
Attorney of Record for
WEEKS MARINE, INC.

Of Counsel:
Joseph A, Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PLAINTIFF'S REPLY TO THE DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S REPLY AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Plaintiff Has Established A Clear Violation Of The Letter, Spirit And Intent Of 10 U.S.C. § 2304 And FAR 6.401 Because The Defendant Has Failed To Establish A Valid And Rational Basis To Issue A Negotiated IDIQ/MATOC Solicitation For Dredging . . . . . . . . 1

II. Plaintiff Has Demonstrated That It Will Be Prejudiced By The Procurement Of Dredging According To The Terms Of This Solicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III. There Is No Basis For The Court To Dismiss "Counts III and IV" Because There Were No Such "Counts" In The Complaint And Legal Theories Are Not Subject To A Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV. The Plaintiff Is Entitled To Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A. Success On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B. Irreparable Harm And Balance Of Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## Cases

210 Earll LLC v. United States, 77 Fed. Cl. 710 (2006) .......... 15

CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559 (2004) .......... 30

Essex Electro Engineers, Inc. v. United States, 3 Cl. Ct. 277 (1983) .......... 25, 28

Gould, Inc. v. U.S., 935 F.2d 1271 .......... 22

In Foundation Health Federal Services, 1993 WL 738426 (D.D.C. 1993) .......... 27

Minor Metals, Inc. v. United States, 38 Fed. Cl. 379 (1997) .......... 26

OAO Corp. v. United States, 49 Fed. Cl. 478 (2001) .......... 28

Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728 (2000) .......... 28

Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560 (2000) .......... 28

United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312 (1998) .......... 30

Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841 (D.C.Cir. 1977) .......... 27

Wisconsin Gas Co. v. Federal Energy Regulatory Commission, 758 F.2d 669 (D.C.Cir. 1985). 27

Virginia Petroleum Jobbers Ass'n, v F.P.C, 259 F.2d 921 (D.C. Cir. 1958). .......... 27

Zenith Radio Corp. v. United States, 710 F.2d 806 (Fed Cir. 1983) .......... 26, 27

## Statutes

10 U.S.C. § 2304 .......... 1, 2

10 U.S.C. § 2304c(d) .......... 24

28 U.S.C. § 1491(b)(2) .......... 28

P.L. 95-269 .......... 11

**Regulations**

FAR 6.401 …………………………………………………………………………………. passim

FAR 6.401(a)(2)…………………………………………………………………… 3,10

FAR, Part 14 ………………………………………………………………………………… 3

FAR 15.304(c)(1)……………………………………………………………………… ….5,7

FAR 16.501-2(c)……………………………………………………………………………. 5

FAR 9.104…………………………………………………………………………… … 8,9

FAR 36.103………………………………………………………………………………. 10

FAR 16.500………………………………………………………………………………. 10

EFARS 16.501.S103(a)…………………………………………………………………. 10

FAR, Part 18………………………………………………………………………… …15,16

FAR 6.302-2……………………………………………………………………………….15,16

FAR 15.101-2…………………………………………………………………………… .19

FAR 52.219-8…………………………………………………………………………… .22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 07-700C |
| | : | (Judge Wheeler) |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S REPLY TO THE DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S REPLY AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

The Plaintiff, Weeks Marine, Inc. ("Weeks"), by its undersigned counsel, hereby submits the following reply to the memorandum submitted by the Defendant seeking dismissal of certain "counts " in Plaintiff's Complaint and in further reply and opposition to the Defendant's Cross-Motion for Judgment on the Administrative Record. The Defendant's presentation is somewhat confusing because there were no "counts" in the Plaintiff's complaint. Since it appears that what the Defendant refers to as "counts" were actually the principal arguments presented by the Plaintiff in its opening Memorandum of Law, the Plaintiff will respond accordingly and in the order that the arguments were set forth by the Defendant. The Plaintiff will not address the Court's standard of review because that subject has been adequately addressed in the opening briefs and the parties appear to be in agreement.

**I. Plaintiff Has Established A Clear Violation Of The Letter, Spirit And Intent Of 10 U.S.C. § 2304 And FAR 6.401 Because the Defendant Has Failed To Establish A Valid Basis To Issue A Negotiated IDIQ/MATOC Solicitation For Dredging**

The Defendant suggests that simply because the solicitation states that offers will be evaluated using factors other than price that this means that the solicitation qualifies as an exception to the requirement that sealed bidding must be used when "the award will be made on

the basis of price and other price-related factors." (10 U.S.C. § 2304 et. seq.; FAR 6.401). This sort of specious reasoning certainly can be of no assistance to the Court in deciding the issue at hand. If all that is required in order to avoid the preference for sealed bidding as expressed in10 U.S.C. § 2304, FAR 36.103 and FAR 6.401 is to simply include evaluation factors other than price in the solicitation, no negotiated procurement, IDIQ or stand-alone, could ever be challenged as potentially in violation of procurement law and regulation. Such an approach would effectively enable the government to sidestep any inquiry into whether the stated evaluation factors are necessary or warranted, or any inquiry into whether they actually serve as discriminators between competing proposals. It is for that reason that the purpose of the IDIQ contract and the underlying task orders must be examined as well. If the Court were to adopt the Defendant's overly-simplistic view, the result would be that it would be entirely possible for a series of task orders that would never survive individual scrutiny as stand-alone negotiated procurements to become collectively validated simply because they fell under the umbrella of the original, flawed, MATOC solicitation. The Defendant's argument effectively asks this Court to completely ignore the nexus between the MATOC solicitation and the dredging work to be performed on the ensuing task orders.

The Defendant's argument demonstrates that the Corps sees this MATOC procurement, as explained in the Corps' Acquisition Plan (AR 8) as something far larger in scope than a mere IDIQ solicitation; something that involves a "cultural shift." (AR 44).. In fact, according to the Defendant's Memorandum of Law, it is seen by the Corps as the implementation of a new procurement <u>system</u> for dredging. This new "system" is based upon a distortion of the procurement regulations related to negotiated procurements, and the rules regarding IDIQ/MATOC solicitations, in a way that was never envisioned or authorized by existing procurement law or regulation. In this regard, it is noteworthy that the Defendant's

Memorandum of Law continually refers to the subject MATOC solicitation as the "new bidding system" (emphasis added) in marked contrast to the old system that it is intended to replace. (Defendant's Memorandum of Law refers to the "new" or revised bidding system on pages 3, 9, 10, 14, 15, and 16, and refers to the "old" or "previous" sealed bidding system on pages 5, 6, 9, 15, 16, 17, 18, 27, and 28). What the Defendant overlooks is that the "old" system is the existing sealed bidding system under FAR, Part 14 – a system that the regulations provide shall be used except when the factors in FAR 6.401(a)(2) do not apply. The so-called "new" system does not exist anywhere and actually violates a number of procurement regulations, as will be explained below. It is nothing more than a concocted scheme, called an "Acquisition Plan," designed to increase the Corps' "flexibility" without regard to compliance with procurement law and regulation.

The structure of this solicitation is not conventional and it does not fit neatly into one of the commonly understood contract types in federal procurement. The scope of the Defendant's distortion of the rules, designed to implement its proposed "new system," only becomes evident when the component parts of the solicitation are examined individually. At its core, the solicitation is purported to be an IDIQ procurement. The first question, therefore, is what is the service that is being procured? It apparently is not, as would normally be expected in a contract of this type, the dredging of unspecified quantities of cubic yards of different kinds of subsurface materials. That is, after all, what dredging contractors do – they essentially dig dirt. In maintenance dredging, beach nourishment, and shore protection, that "dirt" may be sand, or mud, or clay, or any one of countless combinations of soil types that exist in a subaqueous environment. The "quantity" in the term IDIQ would therefore be expected to be a quantity of excavated dredged material expressed in terms of cubic yards. That "quantity" would not, under any circumstances, be the quantity of the task orders to be performed. The government does not

procure task orders, it procures the work, in this case dredging, that is performed by those task orders.

In addition to the fact that this so-called IDIQ contract does not actually procure a quantity of dredging work, there is nothing "indefinite" about either the delivery or the quantity. Indefinite delivery means that there is uncertainty about when the services will be needed, but here the upcoming projects are listed and we are told that environmental windows require that they be performed on tight, predictable schedules. As such, the schedule more closely resembles a definite delivery schedule than an indefinite one.

Similarly, there is nothing about the quantity that is indefinite. While the number of cubic yards of varying types of materials that would need to be dredged during a five year period would indeed be indefinite, that is not the sort of "quantity" that the solicitation is designed to procure. The quantity in this solicitation is a quantity of task orders and the number that will be required in each group is estimated, within a narrow range, in the solicitation. (AR 38-41). Accordingly, the solicitation provides for a fairly definite number of task order projects that will need to be performed on a fairly definite schedule. This is hardly what is envisioned by an IDIQ contract.

Once the basis for issuing an IDIQ solicitation in the first place is stripped away, the fact that it is a MATOC form of an IDIQ solicitation becomes secondary. If the purported plan to acquire dredging services was improperly structured as an IDIQ solicitation for failure to identify an appropriate quantity of work, or for failing to meet the inherent requirement that the services and the delivery be indefinite, there can not possibly be a basis to issue this flawed IDIQ solicitation as a MATOC solicitation either. That would simply multiply the government's error, resulting in the award of multiple flawed contracts.

Even if the procurement had been properly structured as an IDIQ/MATOC solicitation,

the next question would be whether there was a basis to issue it as a negotiated procurement? The Defendant claims that the mere fact that the solicitation contains evaluation factors other than price is enough to show that sealed bidding was not appropriate. Aside from the fact that this specious and overly-simplistic argument ignores the nexus between the MATOC solicitation and the dredging work that is to be performed by the underlying task orders, the Defendant also fails to recognize that a required evaluation factor, price, has not even been properly included as an evaluation factor in the subject solicitation. Although a procurement that includes evaluation factors other than price cannot be solicited through sealed bidding, a solicitation that excludes price as an evaluation factor is not permitted under sealed bidding or contracting by negotiation. FAR 15.304(c)(1) requires that price must be a factor in the evaluation of every negotiated procurement. In fact, FAR 16.501-2(c) provides that "Indefinite-delivery contracts may provide for any appropriate cost or pricing arrangement under Part 16. Cost or pricing arrangements that provide for an estimated quantity of supplies or services (*e.g.*, estimated number of labor hours) must comply with the appropriate procedures of this subpart." It should be noted, moreover, that the regulation speaks in terms of "supplies or services," not task orders.[1]

In essence, this procurement is not actually structured to procure dredging services. If it had been so structured, the offerors would have been asked to provide unit prices for performing different kinds of dredging. For example, there could have been line items, or bid items, for the cost of performing hopper dredging in sand, or hydraulic cutterhead excavation in clay, at so much per cubic yard. Or there could have been line items for the maintenance dredging of the Savannah River, the Mobile River, and numerous other rivers or harbors based upon detailed plans and specifications that would have given the bidders or offerors a geotechnical assessment

[1] It is impossible to provide a task order unit price in the solicitation because that would presume that that the task orders themselves were the units being procured when, in fact, it is the dredging services that are supposed to be what is being procured.

of the subsurface conditions (as is common in all dredging solicitations). The problem the Corps faced, however, was that it would have been virtually impossible to have solicited prices on the hundreds, if not thousands, of different line items that would have been required to provide pricing for all of the types of dredging that could be encountered in the South Atlantic Division. That, of course, only serves to highlight why these dredging services are not susceptible to procurement by the issuance of a negotiated IDIQ/MATOC solicitation. In fact, the solicitation does not even require offerors to submit any pricing information regarding the cost of performing the underlying task order work – dredging.

The need to include price as an evaluation factor was not lost on the Corps, however, and the record reveals that it wrestled with the problem. The Corps decided, in Solicitation Amendment No. 5, issued on August 7, 2007, that the only way to include price as an evaluation factor in this IDIQ procurement was to require the offerors to submit a pricing proposal on one of four initial task order solicitations (AR 91, 125,137, 420) and to further require the offerors to submit technical proposals for each group in which they wished to be qualified. (AR 420). Although the solicitation was not particularly clear about whether more than one pricing proposal was required, the Corps issued a clarification in response to an industry question, as follows:

> Q. We interpreted the specs to read that we are required to submit a separate pricing proposal for each group we are bidding. . . .
>
> A. . . . You may submit a Technical Proposal for two or three of the Groups but must submit only one Pricing Proposal.

(AR 420). In other words, a dredging contractor interested in receiving a MATOC award for participation in Group 1, Hopper Dredging Projects, and Group 3, Shoreline Protection Projects, would need to submit a technical proposal for each group, but would only be required to submit a pricing proposal for <u>one</u> of the two groups.

The problem with this procedure is that it does not provide any pricing information by which to assess, or compare, the reasonableness of the offerors' prices on any of the work to be performed on the subsequent task orders within a particular group, much less another group. Unlike the earlier example where the offeror would have provided a unit price for dredging sand that could later be used as the unit price for dredging sand on the ensuing task orders, the pricing of a single task order does not provide any basis to determine the reasonableness of future pricing on any subsequent task order. Most assuredly, the submission of a pricing proposal for hopper dredging would be of even less and actually no value in assessing price reasonableness on future shoreline protection task orders. In fact, it is entirely possible that offers will be received on some of the task orders at unreasonably high prices because certain offerors may not be in a position to perform the work because of other commitments and will simply submit a price proposal to avoid being excluded from the MATOC program for the next five years. Will these proposals then be rejected because the pricing on one task order was too high?[2]

It is apparent that the Corps, realizing that some sort of price reasonableness evaluation had to be conducted, simply settled on a bootstrapped approach that attempts to use the initial task order price as the functional equivalent of the MATOC price. This approach is fatally flawed because it does not present any valid basis to evaluate the prices of the offerors on the MATOC solicitation for purposes of making a "best value" award; it simply provides a basis to compare the prices of the offers on the first task order. In effect, there is no MATOC price evaluation factor and the solicitation therefore violates FAR 15.304(c)(1).

The Corps has also stated that the maximum number of awards in each Group will be

---

[2] In reality, we suspect that the Corps expects to accept any price proposal as reasonable because the purpose of the price proposal is not to evaluate the reasonableness of the prices for doing differing kinds of dredging work, the purpose of the pricing proposal is simply to allow the Corps, in the most superficial way, to contend that the solicitation complied with FAR 15.304(c)(1) that requires that price be evaluated in every source selection.

made and that the total number of awards will be based on the number of technically acceptable proposals received. (AR 93, 124). Whether or not an offer is technically acceptable is to be based on a pass/fail determination of whether or not the offer meets the technical standards in the solicitation. (AR 153). The technical standards for each group can be met by the offeror by merely furnishing documentation that it possesses a dredge. In the case of a hopper dredge for Group 1 it must also be shown that the vessel is Coast Guard certified, and for small businesses in Group 2 evidence of small business status and evidence of the ability to acquire performance and payment bonds of at least $10,000,000. (AR 134-37) is all that is required. These cannot properly be classified s technical evaluation factors that go to the issue of ”technical merit.” In reality, the Corps apparently has no interest in evaluating whether or not offerors actually have the technical capability to perform the dredging work. If it had such an interest, the solicitation would have required the submission of information about the technical characteristics of the offeror's equipment, and the solicitation would have contained evaluation factors designed to enable an assessment of the relative technical merit of each offeror.

The Defendant repeatedly refers to the differences between the responsibility determinations that the government routinely makes in sealed bid procurements, and the purportedly more detailed and considered evaluation of an offeror’s capabilities the Corps plans to make before awarding a MATOC.[3] An examination of the stated evaluation factors, such as Technical Merit and Past Performance, reveals that they are simply a repetition of the responsibility criteria in FAR 9.104 used to evaluate the lowest responsive bidder in a sealed bid

---

[3] Although the Defendant would have this Court believe that the determination of responsibility in sealed bidding is only a perfunctory checking off of items on a list, a responsibility determination is significantly more involved than the Defendant would imply. A review of the Preaward Survey Program Guidebook of the Defense Contract Management Agency, which conducts nearly all preaward surveys for the Department of Defense, reveals the comprehensive nature of the investigations of potential contractors. (http://guidebook.dcma.mil/42/ Preawardguidebk.htm).

procurement. (Plaintiff's Memorandum of Law, page 24). The only difference the Defendant asserts is that under the MATOC solicitation, offerors can be ranked in gradations as outstanding, above average, satisfactory, none, marginal and unsatisfactory, and the Corps can assign prospective MATOC offerors ratings such as, very low risk, low risk, etc; instead of merely "review[ing] a checklist" under a sealed bid procurement. (Def. Memorandum of Law, pages 15-16). The problem, however, is that this solicitation reveals that those kinds of differentiations are not going to be made in the MATOC source selection process.

Contrary to Defendant's assertions, however, the acquisition plan reveals that it is the Corps' intent to include all contractors who have previously performed dredging for the SAD and it has no intention of excluding any offeror who meets the "technically acceptable" standard as defined in the solicitation. (AR 28). Certainly, including all "technically acceptable" offerors, rather than excluding offerors based on qualitative evaluations of past performance or utilization of small business means that this MATOC source selection is not very different from the responsibility requirements of FAR 9.104 that apply in sealed bidding. After all, the solicitation states that the Corps intends "that the total number of awards in each group will be based upon the number of qualified, responsive, and responsible contractors submitting technically acceptable proposals." (AR 124). It should be noted that the terms, responsive and responsible, refer to the determinations associated with the evaluation of sealed bids. Even though the Corps goes to great lengths to couch its source selection for the MATOC in negotiated terminology, all it has ever intended to do, and will do, is conduct responsiveness and responsibility determinations concerning the MATOC awardees, just what it would do in a sealed bid procurement. This "new" system is composed of smoke and mirrors which Plaintiff requests the Court to disregard and conclude that the record lacks a rational basis for the Defendant's implementation of its "new" dredging procurement system.

Just as in the case of the "Price" factor discussed above, the Corps' technical evaluation is a sham. Since the Corps has no real intention of eliminating or discriminating between technically acceptable offerors in its source selection, the "evaluation" of non-price factors is merely part of the process to improperly justify the use of negotiated IDIQ multiple award task order contracts in order to assert “command and control.”

It is apparent, therefore, that this solicitation not only violates the Competition in Contracting Act, as implemented by FAR 36.103 and FAR 6.401(a)(2) in that sealed bidding is mandated when evaluation factors other than price will not actually be employed in the source selection of the MATOC contractors. In fact, and incredibly, the solicitation will not consider or evaluate technical factors related to the performance of dredging, and the Corps seems to have overlooked the fact that price is always required to be an evaluation factor. FAR 15.304(c)(1). In addition, it is also apparent that the solicitation does not comply with the FAR 16.500 and EFARS 16.501.S103(a) requirements for the issuance of an IDIQ solicitation because the requirements are not indefinite, the solicitation is not for the procurement of supplies or services**,** and there is no way to assess pricing as part of the source selection of the MATOC contractors or to ascertain price reasonableness on the ensuing task orders.

The Court must not overlook what this procurement is really all about. It is not simply, as the Defendant would have the Court believe, a negotiated IDIQ procurement for dredging services. It is an abandonment of the “old system” – sealed bidding (the one that is preferred by statute and regulation ) – in favor of some conjured up “new system” designed to give the Corps greater flexibility in its procurement of dredging. Disturbingly, what is meant by this “flexibility” is the ability to assert “command and control and orchestration of dredging work back to the Government.” (AR 9). Aside from the fact that this plan blatantly violates the Congressionally authorized policy of reducing the Corps’ fleet of dredges to a minimum so that

private industry would have an incentive to invest in the equipment needed to perform the bulk of the Corps' dredging mission, P.L. 95-269, it is based upon a number of premises that are not factually, much less rationally, supported in the record.

The Defendant also makes a number of bold conclusory statements in its Memorandum of Law that largely parrot statements in the Acquisition Plan, many of which have already been addressed in the Plaintiff's Memorandum of Law. The Plaintiff does not want to burden the Court with repetitive arguments, but a few comments in response to some of the "recurrent themes" raised in the Government's brief in support of the alleged need to move to a new "system" are offered for the Court's consideration, as follows:

**A Shortage Of Businesses To Handle The Dredging Work**

The Defendant suggests that it is difficult to find enough dredging contractors to handle the work and that there is a shortage of viable dredging contractors. (Def. Memorandum of Law, pages 4-6). This contention is not supported by the Administrative Record. The Defendant has established, by its market research, that there is "sufficient interest in all contract opportunities to ensure adequate competition." (AR 28). Clearly, if the participation on the part of industry is sufficient to ensure competition, there cannot be a shortage of contractors. In addition, it would not have been possible for SAD to have "excelled" in its dredging program execution for the past two years, if there had truly been a "shortage of viable dredging contractors." (AR 10).

**Sealed Bidding Does Not Give The Contracting Officer The Flexibility To Consider Availability Of Equipment As A Factor In Awarding A Contract, But In Negotiated Procurements Logistical Problems May Be Addressed So That All Work May Be Completed Quickly**

The comment on page 6 of the Defendant's Memorandum of Law regarding the perceived need of the Contracting Officer to be able to address "logistical" problems is quite revealing and seems to be an integral part of the Corps' intention to use the negotiated procurement system to assert "command and control" over the dredging industry. (AR 9, 44).

One of the problems that dredging companies continually face is how to allocate equipment in a way that will enable them to maximize equipment utilization and perform as many projects as possible in a given year. Although the Corps would have the Court believe that there is too much work for the dredging industry to handle,[4] the truth is that the industry believes that the contrary is true and that the Corps, nationally, has not contracted out enough work to meet the capabilities of the industry.[5]

The crux of the problem that the government is addressing is as much the fault of poor planning by the Corps as it is any lack of capacity within the industry. There are times when a dredging contractor expects to complete a current project by a certain date and therefore bids an upcoming project so that his dredging equipment can move to next project. In an ideal world dredging contractors would move from project to project with plenty of time for the mobilization and demobilization of equipment, with plenty of time to make equipment repairs and to perform routine maintenance, and without the pesky interference of things like differing site conditions, changes, variations in estimated quantities (overruns), equipment breakdowns, bad weather, or just plain bad luck. It is the nature of the business that things do not always go as smoothly as either the industry or the Corps would like.

The issue is whether that problem is one that the negotiated IDIQ/FORMAT is likely to remedy? We think not. There is no question that the Corps is not happy when a contractor's equipment arrives late, even if it was not the result of overly optimistic scheduling by the contractor. In a world of so many competing interests – the need of the contractors to perform as many projects as possible, versus the need of the Corps to meet the restrictions of environmental

---

[4] If that were true, it would be difficult to see how setting up the "closed shop" envisioned by the MATOC program would increase the capacity of the dredging industry to perform SAD's work.

[5] The Corps maintains and operates four hopper dredges and effectively competes with private industry for dredging work. (GAO Report No. GAO-03-382, page 1).

dredging windows, and to respond to the clamoring of local communities to get their work done as soon as possible[6] - the Corps has been known to blame the dredging industry for problems that the Corps actually causes or for problems that are beyond the control of either party. While the Administrative Record laments the "finite" size of the dredging industry (AR 9, 20, 45), it fails to recognize that asserting greater governmental control is not the answer and certainly will not foster the growth of the industry.

It is more important for the Corps to do a better job of scheduling and advertising projects well in advance of when they will be needed than it is for the Corps to find ways to "shorten the procurement cycle." The Corps needs to do a better job of providing more accurate and timely prebid surveys of expected dredge quantities, and to provide better information about expected subsurface conditions in areas where the nature of the material may be an issue. Some of the problems that the Corps faces may be successfully addressed by the regionalization plan addressed in the record (AR 69-71) which the Plaintiff does not oppose and which is not a subject of this protest. What the Plaintiff, and indeed the dredging industry, does oppose is the notion that the assertion of "command and control" is the answer.

What we suspect that the Corps means by "command and control" in the context of the "flexibility to consider equipment availability as an evaluation factor" (Defendant's Memo of Law, page 6) is that during the evaluation process preceding the award of a task order the Corps will decide whether a contractor can truly deliver equipment to the site in what the Corps considers to be a timely manner. If not, the Corps will make a "best value" source selection of a

[6] Many of the South Atlantic Division's dredging projects involve "beach nourishment," which becomes necessary after storms or natural erosive forces cause the shrinkage in the size of beaches in resort areas. To remedy the problem, a dredge is parked somewhere offshore and sand is pumped from a government designated borrow area through a pipeline back onto the beach. Local communities use political representatives and the media to put as much pressure as possible on the Corps to get the beach nourishment completed in time for the next vacation season. (In some locations, the vacation season is almost year round).

higher priced offeror who the Corps believes can better meet the schedule. This notion is full of holes, however. First of all, it ignores the motivation and financial interest that the low bidder has to perform the work in a timely manner. Each dredging project requires the furnishing of a performance bond that ensures that the contractor will perform in a timely manner, and each dredging contract contains a termination for default clause that enables the Corps to severely punish any contractor who violates the terms of the contract. Secondly, giving control to the Corps overlooks the flexibility within the industry to bring in alternate equipment or to subcontract part of the work if it cannot proceed in a timely manner. These decisions are ones that the industry should make, not the contracting officer.[7]

If equipment availability is to become a task order evaluation factor, and that is indeed what this whole negotiated IDIQ/MATOC plan seems to be all about, it is an unwarranted intrusion by the government into the affairs of private industry and it is a distortion of the negotiated contracting rules. Indeed, it explains why the proposed "technical" evaluation factors are not very technical, and it explains why the Corps overlooked the requirement that price be an evaluation factor in the award of a negotiated contract. It even tends to explain why the Corps overlooked the basic need to identify a service, other than the procurement of task orders themselves, in the basic MATOC solicitation. The Corps does not really care about any of those things; the Corps just wants to assert "command and control" over the dredging industry.

It also should not go unnoticed by the Court that nowhere in the Administrative Record does the government provide any tangible or statistical support for the contention that the industry lacks capacity or that the ability of industry to complete projects in a timely manner is

[7] It is never advisable to introduce greater subjectivity into the procurement process. The danger is that one contractor may be given a "break" by being afforded more time to mobilize equipment, but another less-favored contractor may have its proposal rejected under similar circumstances. In the protest-proof world of negotiated task order contracting, this discretion to assess the equipment availability of private industry just does not seem like a good idea.

such an overwhelming problem that it calls for the extraordinary imposition of a new "system" as proposed by this procurement.[8] To the contrary, the record reveals that:

> Over the last two years, SAD has **excelled in program execution on behalf of its customers**. During this timeframe, SAD has awarded 121 contracts for maintenance dredging and 20 contracts for shore protection projects (for a total of 141 contracts) which combined were worth more than $750 million. These totals include 69 projects worth more than $189 million that were awarded to Small Business entities. In addition, over the past thee year, 10 of these maintenance dredging projects worth more than $18 million were considered emergencies and procured using other than full and open competition in accordance with FAR 6.302-2, Unusual and Compelling Urgency

(Emphasis added)(AR 10-11; AR 50-51). Nowhere in the Defendant's Memorandum of Law does the government address, much less attempt to explain, these statistics or the fact that the government's own characterization of its performance record conclusively refutes the need for a change from the long-standing sealed bidding system that has work so well for so many years.

**Emergency Dredging Contracts Are Often Awarded Without Full And Open Competition**

The Defendant asserts that the "new" MATOC program will somehow assure that emergency dredging contracts are no longer awarded with less than full and open competition. (Def. Memorandum of Law, p. 5). The Defendant overlooks the fact, however, that an emergency is an occurrence that happens unexpectedly and demands immediate action. It is because of the inherent unpredictability of emergencies that it is not always possible to predict the sort of response that will be required. A great deal depends on the timing and the magnitude of the emergency. To assure that federal agencies have guidance on responding to emergency situations, an entire section of the FAR, Part 18, is devoted to "Emergency Acquisitions" and to matters involving "unusual and compelling urgency."

[8] There can be no better evidence that a contention is arbitrary and capricious, or that it lacks a rational basis, than an Administrative Record that contains no information to support that contention. (210 Earll LLC v. United States, 77 Fed.Cl. 710 (2006).

In the past, when an emergency occurred, the Corps canvassed the industry to determine what dredges were available and then proceeded with the procurement of the emergency services in an expedited manner. The emphasis was, as it should have been, on getting the job done. The fact that only one source may have been available was not as important an issue as was the need to deal with the emergency effectively. Nevertheless, as the Plaintiff has stated previously, there has often been considerable competition for emergency work. (Plaintiff's Memorandum of Law, pages 29-30).

Under the MATOC, very little will change and the Corps will still need to canvass the industry for availability during an emergency. One difference, however, is that the Corps will be confined to the use of the MATOC contractors. If one of the MATOC contractors is not available, the Corps' ability to respond in an emergency situation may, in reality, be slower under MATOC then it was under the emergency procedures specified in FAR 6.302-2 and FAR Part 18. The Court should also note that the record is devoid of any factual support for the Defendant's contention that "MATOCs for dredging work would virtually eliminate the need to limit competition in the case of natural disaster or other national emergencies. (AR 10). It is indeed remarkable that the Corps appears to be fixated on increasing competition during comparatively rare emergency situations while, at the same time, proposing a system that will reduce competition for the projects that make up the bulk of SAD's dredging schedule. [9]

**The Proposed IDIQ/SYSTEM Is Needed To Shorten The Acquisition Cycle**

The government repetitively contends that a justification for using the MATOC approach is that it needs a shortened procurement cycle in order to accomplish the dredging (AR 9, 18, 44, 53). On its face this argument may seem plausible, but when examined in detail, it is nothing

---

[9] It is also interesting that in its listing of "Pros and Cons" in the Administrative Record the Corps states that one of the "Pros" for sealed bidding was that it provides the "maximum opportunity for competition." (AR 25).

more than a hollow pipe dream. The agency asserts that environmental windows, national security and competition among districts for dredging services require a shortened procurement cycle. However, the environmental windows are known and do not change from year to year (AR 27,48). The SAD projects for which dredging services are needed are, for the most part, maintenance dredging, which is done on a cyclical basis. Any dredging for national security concerns can and has been scheduled as needed and Defendant has failed to point to a prior single instance of impact on national security. In fact, the Defendant is justly proud that it has "excelled" in performing the dredging program in the past two years (AR 10, 51). Therefore, the need to shorten the procurement cycle has not been reasonably established.

The Defendant also asserts that because the various districts compete for limited dredging services, it needs a shortened procurement cycle. There is nothing about a shortened procurement cycle that will eliminate or reduce the competition among districts for dredging services. If such "competition" among districts exists, it can be addressed by coordination and planning by the Corps. The lack of proper planning and coordination by the Defendant cannot be a reasonable basis for justifying the use of IDIQ/MATOC contracts.

The Defendant also overlooks that fact that a dredging contractor is entitled to a reasonable time to prepare its estimate, and to plan for the allocation and movement of equipment. While the proposed shortened procurement cycle would allegedly provide a benefit to the Corps, if it could in fact be achieved, the dredging industry would be faced with an arduous task of estimating and planning a project with too little time. The dredging industry makes good use of the normal synopsis and bidding period and, in fact, the Corps has expressed the intention to preserve the normal response time (30 to 45 days). (AR 415).

**<u>There Is A Concern About The Need To Perform Timely Dredging In The Vicinity Of Military Installations, To Assure National Security, And To Assist In Fighting The War On Terror</u>**

There is no question that dredging to support military bases is very important, but that is nothing new. America has endured a number of wars and the Administrative Record contains no information to demonstrate that the dredging industry has ever failed to serve the national interest, and there is not a single example of any such failure. While it is difficult to argue with the open-ended assertion in the Administrative Record "[t]hat not providing timely execution in the vicinity of military installations . . . have devastating impacts. . ., " there is nothing in the record to indicate that there has been a failure to perform that sort of dredging in a timely manner. (AR 17). In fact, any such notion is once again flatly contradicted by SAD's own characterization of its performance as excellent. (AR 10-11; AR 50-51). As far as we know, a nuclear submarine has never run aground navigating the entrance channel to the Kings Bay Naval Base, nor has the dredging industry ever failed to perform dredging that is vital to the needs of any other military installation, or to assist in the preservation of national security. The use of sensational terms like "national security" and the "war on terror" in the government's brief, while attention getting, ring hollow when they are used to attempt to alarm the Court about an issue that is not supported by the facts.

**<u>Minimizing The Delays Of Conducting Separate Procurements Permits Negotiations To Ensure All Potential Offers Understand The Solicitation</u>**

Aside from the fact that the perceived need to minimize the "delays of conducting separate procurements" has been addressed in the Plaintiff's response to the Defendant's contention that the procurement cycle must be shortened, the assertion that negotiated procurement will ensure that "all potential offers understand the solicitation" is misleading. First of all, it assumes that the Corps has encountered a problem with dredging contractors not understanding the solicitation. If there is such a problem, it is not described or factually

supported anywhere in the Administrative Record. In fact, no such lack of understanding exits because members of the dredging fully understand what is involved in maintenance dredging and shore protection. Any assertion to the contrary is simply nonsense.

Secondly, even if the Defendant had somehow managed to support such an assertion, the Acquisition Plan and the solicitation make it clear that the Corps intends to award the MATOC contracts and the ensuing task orders without discussions. (AR 31, 124). In fact, the Acquisition Plan states that most of the task orders will be awarded under the Lowest Price Technically Acceptable ("LPTA") approach specified in FAR 15.101-2. (AR 14). Nowhere in its brief does the Defendant explain how the Corps will ensure that potential offerors understand the solicitation if it does not discuss the issue as part of the formal negotiating process. In fact, and to the contrary, if there is anything that the Administrative Record makes abundantly clear it is that the Corps has no intention of actually negotiating any aspect of this so-called negotiated procurement; neither under the MATOC solicitation nor under the ensuing task order solicitation.

**The IDIQ/MATOC System Will Permit The Corps To Prioritize The Work By Issuing Task Orders**

The Defendant argues that the use of MATOC will give "the Corps the flexibility to identify the most significant work that needs to be performed and then prioritize that work by issuing task orders. (Def. Memorandum of Law, page 9). The Administrative Record does not support this argument. To the contrary, it is the Corps' centralization of the dredging program management, using the Jacksonville Regional Contracting Center and the Regional Integration Dredging Team, that will enable the Corps to "identify the most significant work," and "prioritize that work" in SAD. The procurement method, whether by sealed bid, RFP, IDIQ, or MATOC, has no bearing on the Corps' ability to identify priorities. (AR 17).

In summary, simply because the Corps has inserted evaluation factors other than price in

the MATOC solicitation, and further reserves the right to utilize "best value" procurement on the underlying task orders, does not mean that there was a rational basis to do so. When FAR 6.401 provides that the award will be made on the basis of price and other price-related factors it implies that that there must be a good reason, and a rational basis, to make an award that includes factors other than price. Simply pointing to the fact that the solicitation contains those other evaluation factors is not enough. To hold otherwise would be to remove the basis for the selection of contracting by negotiation from judicial review.

## II. Plaintiff Has Demonstrated That It Will Be Prejudiced By The Procurement Of Dredging According To The Terms Of This Solicitation

The Defendant suggests that since the Plaintiff does not fear that it will be selected for one of the MATOC contracts that it therefore has not demonstrated that it may be prejudiced by the subject procurement. Of course, the Plaintiff has no way of predicting whether it actually will be selected and there can be no doubt that the denial of a contract that the Plaintiff is qualified to receive would be prejudicial. The Defendant's contention, moreover, incorrectly assumes that the only potential harm to the Plaintiff would be the denial of one of the MATOC contracts. Although the Corps apparently plans to award MATOC contracts to all those who have previously been performing dredging for SAD, and although the Plaintiff believes that it is qualified to receive such an award, there is no guarantee that the Plaintiff will be selected. Prejudice also results from the fact that the fair and open sealed bidding system is being replaced by a "new" negotiated system that serves the single purpose of allowing the Corps to use the leverage of "best value" source selection to control the allocation of dredging equipment. In this way, the Corps will manipulate and "orchestrate" the resources of private industry to the extreme prejudice of the Plaintiff.

It is also the harm that the Plaintiff believes will result after the award of the MATOC contracts that serves as a basis for the Plaintiff's showing of prejudice. Essentially, the Plaintiff

will be prejudiced in that it has built and conducted its business in a manner that is designed to succeed in the objective, openly competitive world of sealed bidding. It competes against other dredging contractors who are all responsible and who all have the equipment and technical know-how to perform dredging projects. The Corps proposes a system that will authorize the award of task orders to those who do not necessarily offer the lowest price depending on nothing more than the Corps' preferences regarding the allocation of equipment.

The Plaintiff will be further prejudiced by the apparent plan, which was revealed for the first time by the release of the Administrative Record, to assert "command and control and orchestration of work back to the Government." (AR 9, 44). This "plan" was never discussed or revealed to the Plaintiff or to the dredging industry generally, and none of the references to industry meetings and none of the extensive Q &A documents in the record allude to any such discussion. The Plaintiff does not wish to have its equipment allocation controlled by the Government and finds this concealed, underlying motive to be both prejudicial to its business interests, and generally disheartening. The heretofore close working relationship between the Corps of Engineers and the dredging industry, at least at the national level, was such that major policy and procurement decisions were openly discussed and they were not secretly imposed, or tested, by the issuance of a purportedly harmless negotiated procurement in one region of the country.

## III. There Is No Basis For The Court To Dismiss "Counts III And IV" Because There Were No Such "Counts" In The Complaint" And Legal Theories Are Not Subject To A Motion to Dismiss

The Defendant's assertion that Plaintiff failed to plead two of its "claims" misses the mark. The Defendant asserts that Weeks' claim that the MATOC solicitation is anticompetitive is not presented in its Complaint. Aside from the fact that there are no "counts" in the Plaintiff's Complaint, as the Defendant alleges, the Complaint, in paragraphs 14-22 addresses the impact of

this proposed procurement on competition and thus complies with the notice pleading requirements in the Federal Rules. (See Gould, Inc. v. U.S., 935 F.2d 1271). The arguments that the Defendant wants to strike, dealing with restrictions on competition and limitations on judicial review, are not counts, nor are they independent claims of illegality. But they *are* aspects of the Plaintiff's argument that define the prejudice to both the Plaintiff and the public. Not only might the Plaintiff have a contract awarded to somebody else who bids higher, but the reason for that award will be subject only to the review of an ombudsman, not by a court, and the public would suffer by paying a premium resulting from a Contracting Officer's unsupervised and unlimited discretion.

The Defendant, after "praising" the Plaintiff for its concern, further contends that the Plaintiff lacks the standing to protest on behalf of small business. It probably does seem ironic to the Corps that one of the largest dredging contractors in the United States would express this concern, especially in light of the fact that the Corps, which is legally obligated to promote the interests of small business, has demonstrated comparatively little real concern for the interests of small business in its Acquisition Plan. The requirement that evidence of a ten million dollar bonding limit be provided, coupled with the high estimated dollar value of the initial task order on which a small business concern's price reasonableness is to be assessed ($10 to $25 million), hardly demonstrates a concern for small business. The fact remains, however, that in challenging the procurement itself, something that it unquestionably has standing to do as a prospective offeror, the Plaintiff has the right to challenge all of the flaws in the solicitation.

It is also incorrect for the Defendant to assert that the interests of small business are not a matter of legitimate concern to the Plaintiff. Federal dredging solicitations have small business utilization requirements (FAR 52.219-8) which depend on a vibrant small business dredging community. Any program, such as the one at issue, which seeks to limit the participation of

small business in the Corps dredging program, will ultimately tend to reduce the size of the small business dredging community.[10] That is a legitimate matter of concern to the Plaintiff.

It may be, if that were the only issue before the Court, that the Plaintiff would be found to lack standing to represent the interests of small business, just as small businesses would have been precluded from representing large businesses. Rather than inviting multiple protests, the Government should acknowledge that the letters in the record (AR 1938-1983), together with the affidavits attached to the Plaintiff's memorandum of law in support of its Motion for Judgment on the Administrative Record, demonstrate a widespread opposition to the procurement by both large and small business dredging concerns. The Plaintiff simply referred to the unfairness to small business as one of the many aspects of the solicitation that are either illegal or unfair.

In addition, the Defendant fails to recognize, much less consider, the effect that its proposed "new bidding system" will have on competition. On the one hand the Defendant laments the fact that the cost of entry into the market that makes it difficult for new dredging companies to participate, but on the other hand it seeks to limit the participation of the already limited number of companies through a MATOC source selection process. The further revelation that this is all part of a plan to "command and control" the dredging industry by making task order source selections based on the Corps' preferences with regard to equipment utilization will certainly not encourage new entries into the market. Businesses do not enter the federal dredging market because they want to be commanded and controlled, they enter the dredging market because the sealed bidding system holds out a potential for reward that is

[10] The Plaintiff recognizes that simply because a small business dredging contractor is not selected for a MATOC contract does not mean that the contractor could not participate in the performance of a task order as a subcontractor. The problem is that since small business dredging contractors depend on receiving their fair share of small business set-aside awards in order to survive, the relegation of those small businesses to subcontracting only would threaten the survival of many of the small companies.

commensurate with the inherent and significant business risks in every dredging project.

The Defendant also contends that Plaintiff failed to plead a claim in its Complaint regarding the limitation or denial of bid protest procedures. Plaintiff's statement regarding the lack of bid protest procedures is merely an iteration of the statute, 10 U.S.C. 2304c(d), that states that whenever an IDIQ/MATOC is issued, contractors have very limited protest procedures and may only protest if the proposed task order exceeds the scope, time or maximum value.[11] Since Defendant chose the IDIQ/MATOC process, which effectively prohibits the bid protests, and since Plaintiff's complaint is challenging the decision and justification to use the MATOC process, Plaintiff's legal theory that MATOC limits or denies statutorily required bid protest procedures is subsumed in its challenge. Defendant's motion to dismiss the Plaintiff's supporting legal argument must be denied.

It is also worth mentioning that if the Plaintiff had waited to protest the use of the negotiated procurement format until after the proposals had been submitted, the Government would have undoubtedly contended that such a protest was untimely. Here, where the Plaintiff has unquestionably filed its protest in a timely manner, the Government still seeks to shield the question of the validity of the procurement method from judicial review by contending that as long as the solicitation contains evaluation factors other price the solicitation complies with FAR 6.401. Accordingly, if it were up to the Government, there would be no way for a prospective offeror to ever challenge the use of contracting by negotiation instead of sealed bidding, much less to challenge the Government's arbitrary and capricious imposition of a "new bidding system." In either case, the Government's procurement decisions, even those significant enough

[11] Under sealed bidding procedures, the Plaintiff may protest the reasonableness of the government estimate, restrictive specifications, defective solicitations, and contract awards. None of these safeguards are permissible protests under an IDIQ/MATOC contract. Defendant's assertion on page 3 of its brief that there will be adequate opportunity to protest under the new system is contradicted by the statute and regulations.

to undermine the historically successful use of sealed bidding for an entire industry, would not be subject to judicial review. It seems as though if the Corps of Engineers has its way, the United States Court of Federal Claims will have little to do in the area of government procurement.

There was no other way for the Plaintiff to challenge the plan to negotiate the task orders other to challenge the entire procurement. Rather than look at possible procedural or technical irregularities in the pleadings, it would be refreshing if the government actually looked at the merits of the case. The fact is that this solicitation violates the law, is unfair to the dredging industry, and simply is a bad idea.

## IV. The Plaintiff Is Entitled To Injunctive Relief

The Plaintiff incorporates its earlier arguments by reference and offers the following responses to the Defendant's arguments regarding the elements of injunctive relief .

### A. Success on the Merits

For the reasons set forth in this reply brief and in the Plaintiff's prior memoranda of law, the Plaintiff is likely to succeed on the merits and is entitled to injunctive relief. A repetition of those arguments is not required.

### B. Irreparable Harm and Balance of Harm

The defendant contends that because any loss of profits that the Plaintiff might incur would not threaten the survival of its business it cannot establish irreparable harm. This Honorable Court, and its predecessor Court of Claims, has consistently recognized that a party disappointed as a result of an arbitrary and capricious or illegal procurement award, may suffer irreparable harm as a result of its statute-based inability to recoup its full economic damages at law. See, e.g., Essex Electro Engineers, Inc. v. United States, 3 Cl.Ct. 277, 287 (1983) (absent injunctive relief, a successful protester "would be irreparably damaged, and an action at law would be unavailing, because [the protestor] could recoup its bid preparation costs in a suit for

damages, but not loss of anticipated profits"). (See the discussion and cases cited in Plaintiff's Memorandum in Support of its Motion for Judgment on the Administrative Record, pages 42-45).

Defendant would have the Court disregard this long, unbroken line of cases, recognizing the economic realities of federal bid protest cases, and hold instead that the "mere" loss of profits on a major two billion dollar MATOC dredging program is not "irreparable harm." In so arguing, Defendant relies upon a single 10 year old decision of this Court and a single unpublished opinion out of the District of District Columbia, both of questionable reasoning and both involving scenarios distinguishable from the present case.

In Minor Metals, Inc. v. United States, 38 Fed.Cl. 379 (1997), for example – the first authority cited by Defendant – the plaintiff had been disappointed in his bid for the purchase of cobalt from the Defense National Stockpile Center. In the Court of Federal Claims, he won a partial summary judgment, in response to which the Government proposed to cancel the solicitation and issue a new one in conformity with the Court's judgment. Plaintiff, meanwhile, moved for a stay pending his appeal, on the remaining aspect of his complaint. In the course of denying a stay pending appeal, the Court held that plaintiff had failed to demonstrate the potential for irreparable injury, since it was free to enter a bid under the new solicitation. The Court also cited the Federal Circuit's decision in Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed Cir. 1983) as "implying that irreparable injury requires a showing of more than just economic harm." 38 Fed.Cl. at 382. The cited passage from Zenith, however, actually stood for the proposition that an injunction in that case was *warranted* because the plaintiff would otherwise be deprived of any effective remedy – and accordingly would support, and not oppose, the majority position of the judges of this Court with respect to injunctive relief where, as here, the plaintiff is foreclosed from recovering his economic damages in an action at law. 710 F.2d at

810. This is a far cry from the suggested holding that economic loss can never support a claim for injunctive relief.

In Foundation Health Federal Services, 1993 WL 738426 (D.D.C. 1993) – Defendant's other cited case – the plaintiff, an incumbent health care provider which was protesting a prospective award to another provider, was seeking an order enjoining the override of the GAO stay. The district court rejected the plaintiff's claims that it would be irreparably harmed by virtue of the competitor becoming "entrenched" while the protest was litigated – first, on grounds that such damage was too speculative, and second, on grounds that "economic loss does not, in and of itself constitute irreparable harm . . . Only economic loss that threatens the survival of a movant's business constitutes irreparable harm." The latter proposition represented an out-of-context citation from the D.C. Circuit's decision in Wisconsin Gas Co. v. Federal Energy Regulatory Commission, 758 F.2d 669, 674 (D.C.Cir. 1985). The *actual* statement by the Court of Appeals, with *all its words included*, was as follows:

> It is also well settled that economic loss does not, in and of itself, constitute irreparable harm. As this court has noted:
>
> > The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.
>
> *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d [921] at 925 [D.C.Cir. 1958]. **Recoverable** monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C.Cir. 1977).

Wisconsin Gas, 758 F.2d at 674 (bolded emphasis supplied; italics in the original). As can be seen from the full quotation, the Court in Wisconsin Gas was referring to the situation in which economic damages *are recoverable* in the litigation. The situation addressed by , Seamans,

Electro and their progeny, however – just like the Plaintiff's current situation – is the absence of any potential recovery of economic damages "in the ordinary course of litigation," due to the restrictions imposed by 28 U.S.C. § 1491(b)(2). This is exactly what makes the threatened harm irreparable in this case, and it is exactly what makes injunctive relief imperative. This Court should decline the Government's invitation to jettison years of consistent holdings, recognizing the fact of irreparable harm in situations such as the situation presented by this case.

The Defendant also cites OAO Corp. v. United States, 49 Fed.Cl. 478, 480 (2001) for the proposition that "Mere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury, however; if they were, any bid protest would involve an irreparable injury." The Defendant neglects to mention that the Court also acknowledges that "a lost opportunity to compete may constitute an irreparable harm." Overstreet Elec. Co. v. United States, 47 Fed.Cl. 728, 744 (2000); Seattle Sec. Servs., Inc. v. United States, 45 Fed.Cl. 560, 571 (2000). This Honorable Court, and its predecessor Court of Claims, have consistently recognized that a party disappointed as a result of an arbitrary and capricious or illegal procurement award, will furthermore suffer irreparable harm as a result of its statute-based inability to recoup its full economic damages at law under 28 U.S.C. § 1491(b)(2). See, e.g., Essex Electro Engineers, Inc. v. United States, 3 Cl.Ct. 277, 287 (1983)

In the case at hand, the harm that the Plaintiff will suffer is the loss of contract awards it would have received under the competitive sealed bidding procedures mandated by the law and applicable regulations.. If an injunction is not issued, Plaintiff will be denied the benefit of a legally valid procurement process as well as a fair opportunity to continue compete fairly on the basis price. Indeed, the business practices of the plaintiff and the entire dredging industry are designed to foster competition on the basis of price.

The Defendant also states that Weeks acknowledges that a number of RFP dredging contracts have been awarded by the Corps over the last two years, referring to the Complaint, ¶ 16, and further poses the question of why the Plaintiff did not protest those procurements if the process was so harmful.. (See Defendant's Memorandum of Law, page 26). Aside from the fact that the Plaintiff is not in the habit of filing protests, much less multiple protests, those were individual procurements that did not have the same harmful consequences to the Plaintiff as the "new" procurement system proposed in the subject solicitation. The Defendant also overlooks the fact that what it refers to as a "number of RFP dredging contracts" was actually information presented by the Plaintiff to establish the comparatively low number of dredging RFPs compared to IFBs in 2006 (16 out of 165) and in 2007 (17 out of 216). (Complaint, ¶ 16).

The Court is respectfully requested to recognize that the harm the Defendant's proposed MATOC solicitation and "new" procurement system will cause is that there will be a loss of an open and transparent bidding process and its replacement with a closed system. There is an overriding public interest in preserving the integrity of the federal procurement process.

**C. Public Interest**

The Defendant contends that it is important for dredging to be performed within the time period allowed by environmental windows, and the Plaintiff does not dispute that contention. In view of the often-referenced excellent performance of SAD it appears that those environmental windows have not posed a problem in the past and the Administrative Record certainly contains no information to the contrary. In addition, the Defendant's references to cases that explain the strong public interest in not interfering with the procurement process of Government agencies hold, by very case the Defendant cited, that "strong public interest" does not apply when applicable laws and regulations have been violated. LABAT-Anderson, Inc. v. United States, 65

Fed. Cl. 570, 581 (2005) "It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." CW Gov't Travel, Inc. v. United States, 61 Fed.Cl. 559, 578 (2004) (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed.Cl. 312, 323 (1998)). It is respectfully submitted that the South Atlantic Division of the Corps does not have the legal authority to create its own, new procurement system for dredging. This is precisely the factual scenario that the Court should address in order to prevent the issuance of an illegal negotiated IDIQ/MATOC solicitation.

**CONCLUSION**

Based upon the foregoing argument, the Court is respectfully requested to grant the Plaintiff's Motion for Judgment on the Administrative Record and the Court is further requested to enjoin the agency from proceeding with the subject MATOC procurement for dredging because the Corps' proposed procurement violates the preference for sealed bidding as provided by the Competition in Contracting Act and FAR 6.401.

Respectfully submitted,

DATED: October 22, 2007

/s/ Michael H. Payne_____
Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779(fax)
mhp@phslegal.com

Attorney of Record for
WEEKS MARINE, INC..

OF COUNSEL:

Joseph A. Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| WEEKS MARINE, INC. | : | |
| Plaintiff, | : | |
| v. | : | No. 07-700C |
| | : | (Judge Wheeler) |
| THE UNITED STATES, | : | |
| Defendant, | : | |

## CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 22nd day of October, 2007, a copy of the foregoing Plaintiff's Reply To The Defendant's Motion To Dismiss And Plaintiff's Reply And Opposition To Defendant's Cross-Motion For Judgment On The Administrative Record was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/S/ Michael H. Payne

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779(fax)
mhp@phslegal.com
Attorney of Record for
WEEKS MARINE, INC.