# In the United States Court of Federal Claims

No. 07-700C

(Filed Under Seal: November 1, 2007)
(Reissued: November 6, 2007)[1]

| | | |
|---|---|---|
| WEEKS MARINE, INC., Plaintiff, | * | Pre-award Bid Protest; Challenge to Agency's IDIQ Multiple Award Task Order Solicitation; Violation of 10 U.S.C. § 2304(a); Rational Basis Test; Injunctive Relief. |
| v. | * | |
| THE UNITED STATES, Defendant. | * | |

*Michael H. Payne*, with whom were *Joseph A. Hackenbracht, Jr.* and *Timothy A. Sullivan*, Payne, Hackenbracht, and Sullivan, Ft. Washington, Pennsylvania, for Plaintiff.

*L. Misha Preheim*, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Harold D. Lester, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

### I. Introduction

[1] The Court issued this opinion under seal on November 1, 2007, and gave the parties until November 8, 2007 to submit any proposed redactions of competition-sensitive, proprietary, confidential or other protected information. The parties have each responded that they have no proposed redactions, and therefore this decision is released in its entirety.

In this pre-award bid protest, Plaintiff Weeks Marine, Inc. ("Weeks") challenges the decision of the United States Army Corps of Engineers, South Atlantic Division ("SAD"), to solicit proposals for maintenance dredging and shore protection projects using negotiated indefinite delivery indefinite quantity ("IDIQ") multiple-award task order contracts. Historically, the Corps of Engineers has employed competitive sealed bidding procedures for dredging work, where contract awards are based upon price. The contemplated change to negotiated IDIQ task order contracting represents a significant departure from SAD's prior practice, and has caused widespread industry criticism.

Weeks filed its Complaint in this Court on September 28, 2007 seeking declaratory and injunctive relief to prevent SAD from employing its new solicitation. SAD issued the solicitation on June 4, 2007, and later amended it on ten occasions. After Weeks filed its Complaint, Defendant agreed to extend the proposal due date until November 1, 2007 to permit the Court's expedited consideration of Weeks's protest. Defendant filed a four-volume Administrative Record on October 5, 2007 consisting of nearly 2,000 pages. The Court also has before it the parties' October 17, 2007 cross-motions under Rule 52.1 for judgment on the Administrative Record, and the parties' October 22, 2007 reply briefs. The Court heard oral argument on October 24, 2007.

As grounds for its protest, Weeks asserts that SAD's proposed change to IDIQ task order contracting is contrary to law, and is without any rational basis. Weeks relies upon 10 U.S.C. § 2304(a) and Federal Acquisition Regulation ("FAR") ¶ 6.401(a), mandating that an agency *shall* use sealed bidding procedures when (1) time permits, (2) awards will be made solely based on price, (3) discussions are not necessary, and (4) the agency reasonably expects to receive more than one bid. Weeks contends that each of these four conditions is met for SAD's dredging contracts, and that no legal basis exists to use negotiation procedures. See also FAR ¶ 14.103-1(a) ("Sealed bidding shall be used whenever the conditions in 6.401(a) are met."); FAR ¶ 36.103(a) ( "The contracting officer shall use sealed bid procedures for a construction contract if the conditions in 6.401(a) apply."). Weeks further states that the agency has violated Corps of Engineers FAR Supplement ("EFARS") ¶ 16.501, S-103(a) because none of the five identified conditions for using indefinite delivery contracts has been satisfied. Weeks also argues that SAD's attempt to justify a move to negotiated IDIQ task order contracting lacks any rational basis.

Defendant argues in opposition that SAD's proposed IDIQ task order contracting is lawful, that the agency has wide discretion in selecting an appropriate procurement method, and that SAD's justification for the change is reasonable under current circumstances. Defendant alleges that SAD expects to save time through task order contracting, and that SAD's future awards will not be made on the basis of price alone, but will consider other factors such as "past performance." Defendant also contends that Weeks has not shown any

prejudice if the solicitation is allowed to go forward because Weeks is a prominent contractor in the dredging industry, and will likely receive ample work under the new procedures.

A disturbing feature of SAD's new procurement method is that approximately $2 billion in task order awards during the next five years would become virtually immune from any judicial or administrative bid protest review. The Federal Acquisition Streamlining Act of 1994 ("FASA") provides that "[a] protest is not authorized in connection with the issuance of a task order or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 10 U.S.C. § 2304c(d); see also FAR ¶ 16.505(a)(9) (same provision). While SAD's current sealed bid awards routinely are subject to bid protest review by the Government Accountability Office ("GAO") or this Court, SAD's task order awards would be insulated from review except in very limited circumstances. Thus, while purporting to use highly discretionary "best value" evaluation procedures in awarding task orders, SAD effectively would remove itself from any bid protest oversight. Defendant argues that the Court must apply the FASA provision that Congress created. However, this provision did not authorize SAD to convert all of its procurements into task orders. The agency's Administrative Record contains no mention or discussion of this important concern.[2]

Despite SAD's attempt to insulate itself from any bid protest review, the Court would be constrained to uphold SAD's new procurement method if it complied with law, and if the reasoning behind the new method was rationally based. However, this is not the case. The new method violates 10 U.S.C. § 2304(a) and related procurement regulations. SAD has raised a number of reasons for its purported move to IDIQ task order contracting, such as: (1) shortening the procurement cycle; (2) reducing administrative costs; (3) reducing the need for emergency contracting with less than full and open competition;[3] and (4) eliminating competition among SAD districts for contractor equipment and resources. As will be explained, SAD's Acquisition Plan conspicuously is lacking in empirical data supporting its rationale, and not one of the reasons advanced, except for the ability to respond to

---

[2] The Court does not regard a Corps of Engineers "ombudsman" procedure included in the solicitation, Administrative Record ("AR") 98, as a viable substitute for the judicial or administrative bid protest review that currently exists for sealed bidding. Under the "ombudsman" procedure, the review is confined to the Corps of Engineers, at either the Contracting Officer or the ombudsman level.

[3] The agency's use of IDIQ task order procedures may be appropriate as a means of responding to emergencies such as hurricanes in the southeast United States, but the agency's data shows that only $18 million of a total of $750 million (2.4 percent) in SAD's procurements for the last two years have been used to combat emergencies. AR 10, 51.

emergencies, justifies SAD's new procedures. See AR 1-71. Moreover, the need to respond to emergencies does not justify a sweeping five-year change for approximately $2 billion in expected procurements. The agency states that its sealed bid approach "has excelled in program execution" during the last two years. AR 10, 50-51. The agency has provided no evidence that the current system is failing or in need of revision. In fact, the Court would be hard-pressed to identify any contracts better suited to sealed bid procurement than dredging. If not appropriate for dredging work, it is difficult to imagine when sealed bidding ought to be used.

After carefully considering the Administrative Record and the parties' arguments, the Court finds that the solicitation violates applicable statutes and regulations, and that SAD's attempted justification for the new procurement approach is without a rational basis. The agency's Acquisition Plan (AR 1-71) is the principal document on which SAD relies, but it fails even to address the legality of the proposed action, and does not satisfy the rational basis test. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). Accordingly, the Court GRANTS Plaintiff's Motion for Judgment on the Administrative Record, and DENIES Defendant's Motion for Judgment on the Administrative Record.[4] The Court permanently enjoins Defendant and the procuring agency, SAD, from employing the solicitation at issue for negotiated IDIQ task order contracting.

## II. Factual Background[5]

This case concerns Solicitation No. W912EP-07-R-0007 for maintenance dredging and shore protection in the South Atlantic Division of the United States Corps of Engineers. The South Atlantic Division encompasses all or part of North Carolina, South Carolina, Georgia, Florida, Alabama, and Mississippi. The South Atlantic Division has district offices

---

[4] Defendant also moved to dismiss two "counts" of the protest because Weeks failed to plead them specifically in the Complaint. This motion is DENIED because the Complaint is not divided into "counts," and the allegations in question simply are arguments supporting Weeks's protest.

[5] The facts cited herein are taken from the Administrative Record. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973).

in Charleston, South Carolina, Mobile, Alabama, Wilmington, North Carolina, Jacksonville, Florida, and Savannah, Georgia. AR 95, 99-101.

Maintenance dredging involves the removal of material which has shoaled since the previous dredging event and which limits the ability of pleasure craft, commercial vessels, and military vessels to utilize navigable waterways. AR 8. Shore protection projects restore private, commercial and government properties along the shoreline damaged by natural erosion from waves, hurricanes, and other weather events. Id. Traditionally, the five district offices of SAD have awarded dredging contracts independently through single-solicitation sealed bids to the lowest responsive and responsible bidder. AR 52.

SAD's Acquisition Plan contains the agency's rationale for its new procurement method. See AR 1-71. The Acquisition Plan consists of a 30-page memorandum, with Appendices A through E attached. Appendix B is the Determination and Findings signed by the Head of the Contracting Activity on September 13, 2007. AR 42-56. Appendix B repeats much of the information contained in the 30-page memorandum. The memorandum states that it was revised on June 18, 2007, but nearly all of the district office signatures approving the Acquisition Plan are from April and May 2007, predating any June 18, 2007 revisions. AR 2-7. The record does not indicate what revisions were made on June 18, 2007. It is unclear why SAD issued the solicitation on June 4, 2007, well before the Head of the Contracting Activity approved the Acquisition Plan on September 13, 2007.

According to SAD, its traditional sealed bidding approach has produced excellent results:

> Over the last two years, SAD has excelled in program execution on behalf of its dredging and shore protection customers. During this timeframe, SAD awarded 121 contracts for maintenance dredging and 20 contracts for shore protection projects (for a total of 141 contracts) which combined were worth more than $750 million. These totals include 69 projects worth more than $189 million that were awarded to small business entities. In addition, over the past three years, 10 of these maintenance dredging projects worth more than $18 million were considered emergencies and procured using other than full and open competition in accordance with FAR 6.302-2, Unusual and Compelling Urgency.

AR 10, 50-51. From this paragraph and an accompanying chart, the Acquisition Plan confirms that, during the past two years, SAD has awarded $189 million of its total $750 million to small business concerns, or 25.2 percent of total procurement dollars. Id.

Despite its acknowledged success in using sealed bid procedures, SAD concludes that procurement under FAR Part 14 is "unacceptable based on the cost and time requirements and limitation of resources within SAD to execute the magnitude of these contracts in a timely manner to meet our customers' needs." AR 52. The Acquisition Plan, however, fails to support this conclusion with any findings or evidence. For example, SAD fails to cite any instances where the use of sealed bidding resulted in untimely project completion. With regard to administrative costs, the record shows that SAD incurred $2,183,949 using sealed bidding during the past two years, representing .29 percent of the $750 million in total procurement dollars. See AR 10, 18. SAD does not explain why this low administrative cost needs to be further reduced.

The Acquisition Plan contains eight "focus areas" that presumably describe SAD's objectives in wanting to employ IDIQ task order contracting:

> • Develop a consistent methodology and process for soliciting, performing, monitoring and administering dredging and shore protection projects.
>
> • Remove the continual struggle between SAD Districts over resources when contracting for work that falls within the same environmental windows.[6]
>
> • Remove the conflict created by multiple districts conducting simultaneous bid openings.
>
> • Reduce the acquisition cycle time to allow more time for actual performance.
>
> • Synchronize the movement of dredges and project execution on a regional basis in lieu of district basis.
>
> • Shift the command and control and orchestration of dredging work back to the Government.
>
> • Ensure the sustainability of the dredging industry base.

---

[6] In some areas of the South Atlantic region, dredging cannot be performed at certain times, such as during turtle nesting season. AR 9. The agency has not indicated when or how long the turtle nesting season is.

• Maintain opportunities for small businesses in the dredging/ shore protection mission.

AR 8-9.

The Acquisition Plan does not contain any analysis of 10 U.S.C. § 2304(a) or FAR ¶ 6.401(a), mandating the use of sealed bid procedures when the four stated conditions are met. The Acquisition Plan does not mention EFARS ¶ 16.501, S-103(a), containing the conditions under which the agency may employ indefinite delivery contracts. The Acquisition Plan does not discuss the fact that the task orders awarded under the IDIQ contracts would be exempt from bid protest review.

Despite this lack of important analysis, SAD concludes that moving to IDIQ multiple-award task order contracts would (1) shorten the procurement cycle thereby enabling SAD to more efficiently accomplish its mission, (2) significantly reduce administrative costs through the advance notice and preparation of individual solicitations, (3) reduce the need for emergency contracting with less than full and open competition, and (4) eliminate inter-district competition over equipment and resources. See AR 10, 33, 43-44, 53. The record, however, contains no credible empirical data or other evidence to support these conclusions. For example, the memorandum states that "[b]ased upon expert technical analysis," shoaling from hurricanes and other weather events is expected to increase in future years. AR 10. However, no "expert technical analysis" is provided.

SAD issued its solicitation on June 4, 2007 for negotiated IDIQ multiple-award task order contracts for a base year and four one-year options. AR 14, 88. The solicitation lists 108 projects divided into four groups that SAD expects to complete during the next five years.[7] AR 38-41, 99-101. Group I consists of certified hopper dredging projects,[8] Group II consists of small business set-aside projects, Groups III consists of shore protection projects, and Group IV was for other projects. Each group contained estimated costs of projects over a five-year period between $440,000,000 and $500,000,000, for a total value of $1,864,000,000. AR 38-41, 93.

---

[7] Plaintiff states, based upon data from the "FedBizOpps" internet site, that SAD, in "business as usual" fashion, has solicited bids for 20 sealed bid contracts from its list of 108 projects since the original proposal due date of July 6, 2007. Pltf's Motion at 18.

[8] "Hopper dredges" are large, self-propelled vessels, and the number of contractors who possess them is limited. AR 46-48.

The agency conducted market research for the solicitation. SAD issued a "Sources Sought Synopsis" through the "FedBizOpps" internet service to seek information regarding the capability and availability of contractors to perform the planned task orders. AR 20, 57-59. Ten contractors, including Weeks, indicated their interest. AR 58. Of those ten contractors, eight had "significant" previous dredging experience, six possessed the hopper dredging equipment necessary to compete for Group I projects, and three qualified as small businesses for Group II projects. AR 21, 58, 426. Weeks was one of only three contractors that had "unlimited" bonding capability, Group I capability, and significant dredging experience. AR 58.

Under the terms of the solicitation, the agency plans to evaluate IDIQ proposals on a "best value" basis using four evaluation factors: technical merit, past performance, price, and utilization of small business concerns. AR 148-52. The technical merit factor simply requires that the offeror possess dredging equipment. AR 127. After offerors without dredging equipment are eliminated, SAD proposes an evaluation method with past performance significantly more important than price, and utilization of small business concerns significantly less important than past performance and price. AR 148. Past performance ratings consist of six categories ranging from "very low risk" to "very high risk." AR 154. The price factor would be based on an offeror's proposed price for one of four task order projects (one for each group) included in the solicitation. AR 93-94. Offerors may submit proposals for more than one group, and an offeror's price rating could vary for each group. AR 93.

The task order packages on which offerors would submit prices consist of detailed sets of drawings and specifications, much like the agency would use for sealed bid procurements. The task order packages included in the solicitation for pricing were: Group I – Entrance Channel, Kings Bay, Georgia and Fernandina Harbor, Florida, AR 428-713; Group II – Intracoastal Waterway, Jacksonville to Miami, Florida, AR 714-1394; Group III – Captiva Island, Beach Renourishment Project, Lee County Florida, AR 1395-1668; and Group IV – U.S. Naval Station, Maintenance Dredging, Mayport, Florida, AR 1669-1937. All of SAD's forecasted projects for the next five years are listed in the Acquisition Plan. AR 38-41. Thus, the agency is aware of the exact projects to be performed, and the estimated cost for each project. Id.

The agency's Acquisition Plan indicates that SAD expects to award between eight and 26 IDIQ contracts, broken down as follows: Group I – 2-5 contracts; Group II – 2-7 contracts; Group III – 2-7 contracts; and Group IV – 2-7 contracts. AR 11. SAD intends to make these awards without discussions. AR 156. Each IDIQ contractor would be eligible to compete for the $500,000,000 in task orders within its group, but the minimum guarantee for each contract is only $2,500. AR 14, 93. Task orders would be awarded through Low

Price Technical Acceptable procedures or "best value" procedures in accordance with FAR ¶ 16.505. AR 14, 94. SAD intends to award task orders in as little as two hours without discussions. AR 96. The IDIQ contracts do not contain any prices that will be used later in awarding task orders. Each task order will be separately bid based upon the detailed drawings and specifications provided in the task order package. AR 94.

SAD's IDIQ solicitation prompted sharp reactions from the dredging industry. Prospective contractors submitted hundreds of questions and SAD amended the solicitation ten times from June through September 2007. Five contractors, including Weeks, submitted letters to SAD detailing how the solicitation would negatively impact the industry. For example, Cottrell Contracting Corporation explained how the solicitation overlooked the needs of small businesses, and would exacerbate scheduling and equipment allocation problems. AR 1938-39. Great Lakes Dredge & Dock Company reasoned that the solicitation was "detrimental to both the dredging industry and to the Corps" because "an open and transparent bidding and award system is critical to the integrity and success of the low bid procurement process." AR 1947. Manson Construction Company expressed its strong disagreement with the solicitation, reminding SAD that sealed bids had proven very successful in the past and that task order contracting only made sense for emergency dredging projects. AR 1959-64. Mike Hooks, Inc. informed SAD that it would be unable to submit a bid on any of the four initial task orders because none of the four projects was a local project in the Mobile District. AR 1972-73. Mike Hooks expressed concern that it could be denied future local task orders if it submitted an initial high proposal. AR 1972-73. Finally, Weeks voiced its concern over the negative impact that the solicitation would have on the industry. AR 1977-82. This judicial action followed when Weeks filed its Complaint for declaratory and injunctive relief on September 28, 2007.

## III. Discussion

### A. Jurisdiction And Standard Of Review

The Tucker Act grants the Court jurisdiction to hear bid protests "in connection with a procurement or proposed procurement." See 28 U.S.C. § 1491(b)(1). To afford relief in bid protest cases, the Court "may award any relief that [it] considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

In reviewing motions under Rule 52.1, the Court must make findings of fact and determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed.

Cir. 2005)). The resolution of cross-motions for judgment under Rule 52.1 is akin to an expedited trial on "the paper record." Id.

The Court reviews challenges to agency actions in a bid protest according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Under this standard, a reviewing Court shall set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (incorporated by reference in 28 U.S.C. § 1491(b)(4)); see also Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004). Accordingly, in order for the Court to enjoin SAD's solicitation, Weeks must first show either that the decision constitutes a clear violation of applicable statutes or regulations, or that SAD failed to provide a coherent and reasonable explanation of its exercise of discretion. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001) (internal citations omitted). If Weeks meets its initial burden, it then must show that it will suffer prejudice as a result of the proposed solicitation. Bannum, 404 F.3d at 1353; but see Winstar Comm., Inc. v. United States, 41 Fed. Cl. 748, 763 n.9 (1998) ("[t]he prejudice requirement applicable in post-award protests cannot be applied in solicitation protests.").

B. SAD's IDIQ Solicitation Violates Applicable Law.

It is true that a procuring agency has wide latitude to determine the most suitable procurement method, and that "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Impresa, 238 F.3d at 1333 (quoting Latecoere Int'l, Inc. v. United States Dept. of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). That discretion, however, does not empower an agency to employ a procurement method in violation of applicable law. In this case, Weeks contends that SAD's IDIQ task order procurement violates statutes and regulations requiring the mandatory use of sealed bidding. Weeks also argues that none of the conditions for using indefinite delivery contracts under the agency's EFARS regulations has been met.

1. SAD's Solicitation Violates 10 U.S.C. § 2304 and Related Regulations.

The general requirement to use competitive procedures in federal procurements is codified in 10 U.S.C. § 2304(a):

> (a)(1) Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting procurement for property or services –

> (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and
>
> (B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.
>
> (2) In determining the competitive procedure appropriate under the circumstances, the head of an agency –
>
> (A) *shall* solicit sealed bids if –
>
> (i) time permits the solicitation, submission, and evaluation of sealed bids;
>
> (ii) the award will be made on the basis of price and other price-related factors;
>
> (iii) it is not necessary to conduct discussions with the responding sources about their bids; and
>
> (iv) there is a reasonable expectation of receiving more than one sealed bid; and
>
> (B) *shall* request competitive proposals if sealed bids are not appropriate under clause (A).

10 U.S.C. § 2304(a) (emphasis added). Applicable FAR provisions mirror these same requirements. See FAR ¶ 6.401 (same provision as above); FAR ¶ 14.103-1(a) ("Sealed bidding *shall* be used whenever the conditions in 6.401(a) are met") (emphasis added); FAR ¶ 36.103(a) ("The contracting officer *shall* use sealed bid procedures for a construction contract if the conditions in 6.401(a) apply . . . .") (emphasis added).

The agency's Acquisition Plan makes no mention of the above legal requirements, and thus does not contain any analysis of 10 U.S.C. § 2304 or FAR ¶ 6.401. At a minimum, the Court would expect to see some legal discussion of the sealed bidding requirements, and some analysis of why sealed bidding should not be used in this most basic of construction work, which dredging work unquestionably is. The Court may conclude that the agency's

justification is lacking when it provides no mention in the Administrative Record of subjects or issues that should have been addressed. See 210 Earll, LLC v. United States, 77 Fed. Cl. 710, 720 (2006) ("We may . . . conclude that [the agency] did not provide a coherent and reasonable explanation for its exercise of discretion – it gave none at all.").

To the extent that the Acquisition Plan offers some rationale allowing the Court to determine whether the four conditions for sealed bidding in 10 U.S.C. § 2304(a)(2) and FAR ¶ 6.401(a) are met, the agency apparently asserts that (1) time does not permit the use of sealed bidding, and (2) the award decisions will be based on factors other than price.

First, with respect to time, FAR ¶ 5.203 requires an agency to provide a 15-day notice of proposed contract action, and to permit at least a 30-day response time for receipt of bids or proposals after a solicitation's issuance date. SAD has indicated that it typically will afford at least a 30-day response time for the receipt of task order proposals. See AR 415 ("Normal response times (i.e., 30-45 days) will be maintained whenever possible."). Given the volume of pages comprising each task order request, consisting of the drawings and specifications normally used for a sealed bid procurement, any response time less than 30 days would be unreasonable. Thus, the 15-day notice period under FAR ¶ 5.203(a) is the only time savings that the agency would realize from an IDIQ task order approach. This 15-day period would be offset by whatever amount of time the agency consumes in evaluating task order proposals. In sealed bidding, the lowest priced bid is disclosed at the date of public bid opening, whereas proposal evaluation can take more time. As shown by the agency's list of projects in the Acquisition Plan, AR 38-41, SAD is aware of the projects it intends to have performed for the next five years. It does not seem to impose any hardship for the agency to begin its solicitation process 15 days earlier to provide the required notice of proposed contract action.

Second, the agency's stated desire to consider evaluation factors other than price, in the dredging industry, is a weak justification to abandon sealed bidding. The agency's evaluation of technical capability consists merely of the offeror demonstrating that it possesses or has access to dredging equipment. AR 132-36. For past performance, a procuring agency makes standard contractor responsibility determinations under FAR ¶ 9.104 in every sealed bid procurement. Defendant and Weeks both acknowledge that the dredging industry consists of a small group of highly specialized contractors who are well known to SAD. Some of the dredging contractors are family-owned companies with small management organizations. The major barrier to entry is the expensive excavating equipment that a contractor must acquire. Much of the dredging industry's work is performed for the Corps of Engineers. Under these circumstances, where new entries to the business are rare, and where the contractors are well known to the agency, a responsibility determination under FAR ¶ 9.104 should suffice. The fact that the agency expects to notify the successful offeror

"within as little two hours" after receipt of proposals, AR 96, indicates how little analysis the agency anticipates for evaluating factors other than price.

Two of the "focus areas" cited by the agency for its new procurement method are to "[r]emove the continual struggle between SAD Districts over resources when contracting for work that falls within the same environmental windows" and to "[r]emove the conflict created by multiple districts conducting simultaneous bid openings." AR 8. These two objectives seemingly can be accomplished by centralizing the procurement activities in the South Atlantic Division office, and removing them from the district offices. Any "conflicts" or "struggles" among district offices can be achieved without abandoning the sealed bid process. These concerns do not justify a change to IDIQ task order contracting.

In summary, SAD has not pointed to any significant changes in its procurement environment that would warrant a change to IDIQ task order contracting. The Acquisition Plan confirms that SAD has "excelled in program execution" during the last two years, AR 10, 50, and the Court does not see any reasons or developments for moving away from the sealed bid process. Without any analysis of the applicable statutes and regulations, and without citing any significant reasons or developments, the Court must hold that SAD would violate 10 U.S.C. § 2304(a), FAR ¶ 6.401(a), FAR ¶ 14.103-1(a), and FAR ¶ 36.103(a) by employing IDIQ task order contracting methods. As one prospective contractor noted, when applied in the real world of dredging, the solicitation's "evaluation factors will not permit the determination of any meaningful distinctions among the offerors, nor will they allow for any different ways to make task order awards other than simply awarding on the basis of price." AR 1963.

2. <u>SAD's Solicitation Violates EFARS ¶ 16.501, S-103(a).</u>

Weeks also argues that the solicitation is unlawful because, under EFARS ¶ 16.501, S-103(a), SAD may only award indefinite delivery contracts if at least one of five conditions is met. EFARS ¶ 16.501, S-103(a) provides:

> IDC [indefinite delivery contracts] may be used *only if* one or more of the following conditions applies –
>
> 1) The cost to procure the required services or supplies individually through normal selection procedures is uneconomical compared to the cost of the services or supplies themselves;
>
> 2) The time required to procure the required services or supplies individually through normal selection procedures will cause an unacceptable delay in fulfilling the requirements;

> 3) Technical continuity among related requirements is essential;
>
> 4) Significant cost savings in contract price and/or contract administration will accrue by having a single contractor perform several similar requirements; or
>
> 5) Management of more than one contractor on an installation presents unacceptable administration problems in such areas as coordination and movement of work forces and equipment, separation and acceptance of contractor responsibility, and verification of performance and progress.

EFARS ¶ 16.501, S-103(a) (emphasis in original).

The agency's Acquisition Plan does not mention this regulation, and thus it does not contain any analysis of which of the five conditions may apply. Defendant asserts in its brief that this case falls under S-103(a)(2), because the time required to procure through sealed bidding will cause "an unacceptable delay." Def.'s Reply at 4. However, there is no evidence in the record demonstrating that the use of sealed bidding has ever caused "unacceptable delay." Moreover, the agency would realize only a small time savings, if any, from not having to provide a 15-day public notice of proposed contract action under FAR ¶ 5.203(a). Since the agency knows the projects it expects to perform during the next five years, the Court sees no reason why the agency cannot simply begin its procurement process a little earlier to provide the required notice. With proper advanced planning for projects the agency already knows it wants to perform, the Court does not see how the agency would suffer "unacceptable delay."

The law requires federal agencies to follow their own rules and regulations. See, e.g., Wagner v. United States, 365 F.3d 1358, 1361 (Fed. Cir. 2004) (citing Voge v. United States, 844 F.2d 776, 779 (Fed. Cir. 1988) ("It has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all . . . .")). Here, SAD has not even cited or discussed its own EFARS provision in the Administrative Record. The Court is not persuaded that the agency is complying with its own regulation, and therefore a second violation of law exists.

C. SAD's Decision to Use IDIQ Task Order Contracting Lacks a Rational Basis.

Weeks also argues that SAD's decision to change course after decades of sealed bid procurements lacks a rational basis. An agency action will be found arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

A reviewing court may not substitute its judgment for that of the agency. OTI America, Inc. v. United States, 68 Fed. Cl. 646, 653 (2005). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (internal quotation omitted). Deferential review, however, "does not relieve the agency of its obligation to develop an evidentiary basis for its findings." In re Sang-Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002). In order for this Court to achieve meaningful judicial review, SAD "must present a full and reasoned explanation of its decision. [SAD] must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts." Id. at 1342; see also Motor Vehicle Mfrs., 463 U.S. at 43 ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'") (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

In the present case, SAD's stated reasons for departing from sealed bidding can be grouped into four general categories: reducing the procurement cycle, reducing administrative costs, reducing the need for emergency procurement, and eliminating inter-district competition for limited resources. See AR 8-10, 32-33, 43-44, 53. As explained below, the Administrative Record lacks empirical data, and contains only vague assertions. Aside from the important legal issues that SAD does not address, its reasoning in the Acquisition Plan, AR 1-71, does not justify a change to IDIQ task order contracting.

1. Reduced Procurement Cycle

SAD attempts to justify its new method by claiming that IDIQ task order contracting will reduce the procurement cycle, thereby allowing SAD greater flexibility to complete projects in a timely manner and within environmental windows. See AR 9, 18, 44. As noted above, the record shows that at most, moving to task order contracting would result in reducing the procurement cycle by less than 15 days. Even assuming a 15-day reduction, the record contains no evidence showing that a shortened procurement cycle would enhance SAD's ability to complete projects in a timely manner and within environmental windows.

What little evidence exists in the record demonstrates that operating under a shortened cycle may harm industry contractors and ultimately the Corps of Engineers. For example,

Mason Construction Company's July 10, 2007 letter to the agency asserted that the shortened procurement cycle:

> . . . will actually be detrimental to the industry because the scheduling and allocation of equipment will be made more difficult. When dredging contractors are afforded less time to plan for an upcoming project, and are afforded less time to prepare proposals, the inevitable result will be higher pricing and reduced competition.

AR 1960.

This view is confirmed by another contractor who explained that most Requests for Proposals ("RFPs") allow more than a 30-day response time because prospective offerors must evaluate the technical aspects of the plans and specifications, and develop cost effective solutions:

> Removing those documentary components from the bid preparation process does not in any way lessen the calender time required to prepare and submit a professional and complete price proposal. Since no technical details of individual Task Orders are provided prior to issuance of Task Order RFPs, we believe the same amount of contractor time is necessary to prepare responses to individual Task Order RFPs under the [Multiple Award Task Order Contracting] format as under a typical IFB or RFP.

AR 415. SAD answered this comment by stating: "Response times for individual projects (RFPs for Task Orders) will be determined on an individual case-by-case basis. Normal response times (i.e., 30-45 days) will be maintained whenever possible . . . ." Id. Given the 1,510 pages of plans and specifications included in the solicitation for the four initial task orders, it is not surprising that prospective offerors envision the need for substantial time to consider their task order proposals. See AR 428-1937. The record contains no evidence suggesting that future task order packages will be any less detailed.

The record simply is lacking support for SAD's reasoning that moving to task orders and shortening the procurement cycle would be beneficial to the dredging industry, the Corps of Engineers, or its customers.

2. Reduced Administrative Costs

SAD asserts that IDIQ task order contracting will result in a forecasted savings of $1,445,923 in agency administrative costs for a two-year period. AR 18. The Administrative

Record, however, contains no evidence of how this savings is calculated or how it will occur. SAD alleges that its workload "has significantly increased over the years" and concludes that "in order to achieve the mission" it must reduce administrative costs. Id. These statements appear contradictory to SAD's assertion that it has "excelled" at program execution using sealed bidding during the last two years. See AR 10, 50.

SAD calculates its estimated savings by alleging that each Invitation for Bids ("IFB") costs the agency $15,489, while each task order will cost the agency only $4,366. AR 18. The agency calculates these numbers by using hours and rates for contract specialists and contracting officers. Id. The agency's IFB amount is based on actual experience, but the IDIQ and task order hours are only estimates. The record lacks any evidence of how the agency determined the IDIQ and task order hours. For each task order, the agency has estimated that only five hours of contracting officer time will be required. Id. This low estimate belies the suggestion that the agency will carefully consider other non-price evaluation factors in reaching "best value" award decisions.

Even if the alleged $1,445,923 in administrative savings is accepted, this relatively modest dollar amount is not a sufficient justification for a change to IDIQ task order contracting. Defense FAR Supplement ("DFARS") ¶ 207.170-3(ii) states that: "[s]avings in administrative or personnel costs alone do not constitute a sufficient justification for the consolidation of contract requirements unless the total amount of the cost savings is expected to be substantial in relation to the total cost of procurement." SAD's alleged cost savings of $1,445,923 for two years represents roughly .18 percent of the $800 million in estimated procurement costs for a comparable period, far below the "substantial" cost threshold set forth in the regulation. Defendant's characterization of the administrative savings as "significant" is not credible. Def.'s Motion at 19.

3. Reduced Need for Emergency Procurement

SAD contends that moving to IDIQ task order contracting will "virtually eliminate the need" for procurement using less than full and open competition. AR 10. If SAD's solicitation were limited to emergency procurements, such as responding to a hurricane's aftermath, a severe storm or other unexpected condition, its new method might be appropriate. However, SAD reports that for the previous two years, it awarded $18 million in emergency procurements, while the total amount for all procurements was $750 million. AR 10, 51. Thus, emergency procurements represented 2.4 percent of the total. The Court cannot approve of an agency's procurement overhaul where only 2.4 percent of the total estimated expenditure justifies the change. It would not be proper to treat all SAD procurements as if they were emergencies. Moreover, FAR Part 18, "Emergency Acquisitions," contains ample guidance for an agency confronting emergency circumstances.

SAD certainly may rely on FAR Part 18 procedures in the absence of the proposed solicitation, as it apparently has done in the past.

4. Elimination of Competition Among Districts

SAD also cites the need to eliminate competition among its district offices for the limited resources of the dredging industry. Under the current system, each of the five district offices issue separate IFBs on the projects within their respective regions. According to SAD, this process creates a "continual struggle" over limited contractor resources, especially when simultaneous projects and bid openings occur. AR 8. The "continual struggle" among district offices seemingly can be remedied simply by vesting procurement planning and oversight responsibilities within SAD's division office. The perceived need for improved coordination and control does not require a change from sealed bidding to IDIQ task order contracting. The Court would expect better procurement management to be achieved while continuing to use sealed bidding.

5. Other Reasons

The record contains references to three other reasons for SAD's change to IDIQ task order contracting: increased competition, promoting small business participation, and protecting national security. See AR 9, 17, 28, 51. The Court briefly will address these additional reasons.

With regard to increased competition, the agency has found that there is "sufficient interest in all proposed contract opportunities to ensure adequate competition." AR 28. It is difficult to see how the agency may expect to increase competition from what it already experiences under sealed bidding. Without knowing precisely how the agency might proceed under IDIQ task order contracting, it has reserved the right to accept less than all of the IDIQ proposals, AR 11, and some dredging contractors may believe that they are less equipped to compete under the changed IDIQ task order approach. E.g., AR 1972-73 (contractor states it could not respond to the four out-of-region task orders in the solicitation). At best, the competition achieved under the new method could not exceed the competition under sealed bidding, and if any of the potential outcomes mentioned above actually occur, competition would be decreased.

Similarly, the Administrative Record is devoid of credible evidence that the IDIQ task order method is in the best interests of small businesses. Over the past two years using sealed bidding, SAD has awarded 25 percent of total procurement dollars to small businesses. AR 10, 50-51. If anything, the small business bonding requirement in the new solicitation may eliminate some small businesses from participating. The Court notes, for example, that two of the five small businesses that responded to the agency's market research inquiry could not

satisfy a $10 million bonding requirement. AR 14. With the agency already achieving commendable small business results, it is not apparent how the new solicitation will improve upon small business objectives.

Finally, SAD raises national security issues when it asserts vaguely that "[n]ot providing timely execution of dredging in the vicinity of military installations . . . will have devastating impacts on the Army, Navy, and Marine Corps' ability to provide national security . . . . Ultimately, the ability to respond to the global war on terrorism would be negatively impacted." AR 17. While waterways to military installations must be preserved at proper depths, SAD has not provided any evidence that military waterways in the Southeast ever have been imperiled or jeopardized.

For all of the above reasons, the Court concludes that SAD's justification for moving to IDIQ task order contracting lacks a rational basis.

D. Weeks Will Be Prejudiced If The Solicitation Is Allowed To Proceed.

Defendant asks the Court to grant judgment on the Administrative Record on the independent ground that Weeks cannot satisfy the element of prejudice. Defendant argues that Weeks's claim of future harm is "purely speculative at this point in time," and that by Weeks's own admission, it will not suffer if the solicitation is allowed to proceed. Def.'s Reply at 16. Indeed, Weeks admits that it is a "major player in the dredging industry" and would likely be awarded an IDIQ contract and subsequent task orders. Pltf's Motion at 39. Weeks argues however, that it is prejudiced by the likelihood that it will be denied the full benefit of an IDIQ contract award through the "vagaries of the task-order process" that "is capable of being arbitrarily and capriciously administered without recourse to judicial review." Id. at 40. Weeks also claims prejudice from the following: (1) there is "no guarantee" that it will be selected for an IDIQ contract; (2) the fair and open sealed bidding system is being replaced by a "new" negotiated system that serves the single purpose of allowing the Corps of Engineers to use the leverage of "best value" source selection to control the allocation of dredging equipment; (3) it has built and conducted its business around the sealed bid process; and (4) the Corps of Engineers asserting "command and control" over equipment and the industry. Pltf's Reply at 21.

As an initial matter, the Federal Circuit recently held that the proper time for a protest against the terms of the solicitation is *before* the bids or proposals are submitted. Blue and Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."). Consequently, if this Court were to reject Weeks's protest as premature and require Weeks

to wait until it could show a non-speculative harm after award, Weeks would lose its right to protest the terms of the solicitation.

Turning to Weeks's burden on the prejudice element, in an ordinary post-award bid protest, the plaintiff must demonstrate "substantial prejudice" by showing that there was a "substantial chance" it would have been awarded the contract but for the agency's error. Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005). This standard, however, cannot be applied in the context of a solicitation-based protest because the offerors have yet to submit proposals to the agency. As noted in Winstar Comm. Inc. v. United States, 41 Fed. Cl. 748, 763 n. 9 (1998), "[t]his standard of review envisions a review of the contract award or bid evaluation process to determine what might have occurred if the government had not erred. It cannot be applied prospectively when the evaluation of offers has not even begun." In the context of a solicitation-based protest, the plaintiff may satisfy the prejudice requirement by showing that an unreasonable agency decision "created a non-trivial competitive injury which can be redressed by judicial relief." Winstar, 41 Fed. Cl. at 763.

The Court finds this reasoning persuasive and applicable to the present case where Weeks's injury is potentially business threatening. As noted above, Weeks was one of only three contractors that had "unlimited" bonding capability, "significant" dredging experience, and possessed Coast Guard certified equipment for Group One projects. AR 21. Under sealed bidding procedures, there is a substantial chance that Weeks would be the lowest responsive and responsible bidder on a significant portion of the $1,392,000,000 in projects in Groups I, III, and IV. Under the IDIQ task order solicitation, however, Weeks would only be guaranteed a minimum of $2,500 and SAD could deny Weeks all task orders for the next five years without any explanation or discussions, or any ability for Weeks to seek bid protest review. This non-trivial competitive injury is capable of being redressed by this Court.

In sum, the Court finds that when a party brings a protest challenging the terms of a solicitation, it need not satisfy the "substantial chance" test. Rather the protester need only identify a non-trivial competitive injury capable of being redressed by judicial relief. In this case, the solicitation prevents Weeks from competing for $1,392,000,000 in task order awards over the next five years through sealed bidding.

III. Injunctive Relief Is Warranted.

In deciding whether to issue a permanent injunction, this Court considers: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the granting of relief; and (4) whether granting injunctive relief is in the public interest. PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir.

2004). No one factor is dispositive to the Court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others." Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 709 (2006) (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)). Since injunctive relief is drastic in nature, a plaintiff must demonstrate that its right to such relief is clear. Banknote Corp. of America, Inc. v. United States, 56 Fed. Cl. 377, 380-81(2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004).

A. Weeks Has Succeeded On The Merits.

As demonstrated above, Weeks has succeeded on the merits of its protest. Weeks has established that the agency's solicitation for IDIQ task order contracting is in violation of 10 U.S.C. § 2304(a), as well as FAR¶ 6.401(a), FAR¶ 14.103-1(a), and FAR¶ 36.103(a). The agency also has violated its own regulation, EFARS ¶ 16.501, S-103(a). The agency has failed to address any of these requirements in its Acquisition Plan. The agency also has purported to exempt approximately $2 billion in task order awards from any bid protest review, without any mention or discussion in the Administrative Record. The agency's reasons for a change to IDIQ task order contracting are without justification, and therefore the agency's position, even if discussed in the context of the applicable laws and regulations, lacks a rational basis. Weeks has established the first element for injunctive relief in convincing fashion.

B. Weeks Will Suffer Irreparable Harm.

When assessing irreparable harm, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993). Weeks's objective in this lawsuit is to have the Corps of Engineers continue its use of sealed bidding, as it historically has done. If Weeks were to wait until it lost a competitive award under the new IDIQ procurement method, its protest against the solicitation terms would be untimely. See Blue & Gold Fleet, 492 F.3d at 1313. Thus, the only time for Weeks to bring this protest is before proposals are due, as it has done. The only remedy that will satisfy Weeks's protest is for the Court to enter injunctive relief.

The exclusion of SAD's task orders from bid protest review for the next five years also constitutes irreparable harm. Under the present sealed bid method, Weeks has this protest right, but it would be taken away under the IDIQ task order method. The loss of this right could be especially significant where the agency employs subjective "best value" award decisions that Weeks and others may wish to challenge. The Corps of Engineers "ombudsman" procedure included in the solicitation, AR 98, is an inadequate substitute for existing bid protest review.

C. The Balance Of Hardships Favors Granting Relief.

Weeks has brought to this Court for review a Corps of Engineers IDIQ task order method of contracting that is not in accordance with law. The Court has found upon review of the Administrative Record that the justification offered by the agency violates the law and lacks a rational basis. As a prospective major participant in the agency's maintenance dredging and shore protection program, Weeks has an interest in seeing that SAD complies with law in awarding this work. The Court finds that Weeks would suffer a major hardship in having to endure a relatively unknown procurement process that is not in accordance with law. In contrast, the only hardship to Defendant is that the agency must continue to use sealed bidding when required by law. The balancing of these hardships favors Weeks.

D. Injunctive Relief Is In the Public Interest.

The Court finds that the entry of injunctive relief will serve the public interest. The public has an overriding interest in preserving the integrity of the federal procurement process by requiring that the Government follows its own statutes and regulations. Central Arkansas Maintenance, Inc. v. United States, 68 F.3d 1338, 1343 (Fed. Cir. 1995) (Congress intended for courts to use equitable powers to grant qualified firms the opportunity to compete); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he public has a strong interest in preserving the integrity of the procurement process."); Isratex, Inc. v. United States, 25 Cl. Ct. 223, 231 (1992) (Public interest is served by the opportunity for bidding entities to have their bids "fairly and honestly considered by the Government.").

The agency has not indicated with any certainty how many IDIQ contracts it intends to award. See AR 11 (indicating that a range of eight to 26 IDIQ contracts will be awarded). To the extent that the agency may select fewer than all qualified offerors, it effectively will create a "closed shop" environment that is anti-competitive. Although new entries to the dredging industry are infrequent, no new entities would be permitted for the next five years, except under a periodic "refreshing process." AR 93. The public's interest is best served through full and open competition. The sealed bidding method provides for the greatest level of competition.

The agency's exclusion of approximately $2 billion in task order awards from bid protest review for the next five years is not in the public interest. The Court cannot conceive that Congress, when it enacted FASA, intended the elimination of an entire industry from any bid protest oversight for the next five years. The public's interest lies in the assurance that bid protest remedies exist, whether before the GAO or this Court. The public would not favor a procurement system where an agency could award such large dollar contracts without any meaningful oversight.

Finally, the Court acknowledges the public interest in fostering increased small business participation. SAD already was achieving commendable small business goals while employing the sealed bid method for the past two years. AR 10, 51 (showing 25.2 percent of all procurement expenditures going to small businesses). While small business is a separate group under the proposed IDIQ procurement, SAD actually is restricting small business participation by imposing a burdensome $10 million bonding requirement that only three small businesses can meet. AR 21, 426. In contrast, the continued use of sealed bidding best accomplishes full small business participation.

## V. Conclusion

The Court finds that the criteria for issuing injunctive relief have been satisfied. In consideration of the above:

1. The Court GRANTS Plaintiff's Motion for Judgment on the Administrative Record, and DENIES Defendant's Motion for Judgment on the Administrative Record.

2. Defendant, acting by and through the United States Army Corps of Engineers, South Atlantic Division, including their officers, agents, employees, attorneys, and others acting in concert or participation with them, are hereby ENJOINED from using Solicitation No. W912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services.

This Opinion is filed under seal. On or before November 8, 2007, the parties shall carefully review this unredacted opinion for competition-sensitive, proprietary, confidential or other protected information, and submit to the Court proposed redactions to this opinion, if any, before it is released for publication. No costs are awarded to either party.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge