IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-700C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUBMISSION AS ORDERED AT THE NOVEMBER 15, 2007 HEARING AND OPPOSITION TO PLAINTIFF'S REQUEST FOR AN ORDER TO SHOW CAUSE AS TO WHY THE DEFENDANT SHOULD NOT BE FOUND TO BE IN CONTEMPT**

At the hearing on November 15, 2007, the Court ordered defendant to submit the name of the individual at the United States Army Corps of Engineers who reached the decision to issue the Presolicitation Notices for Solicitations numbered W912EP-08-R-0004, W912EP-08-R-0005, W912EP-08-R-0006, and W912EP-08-R-0007.

The decision to issue these notices was made by Ms. Cynthia S. Tolle, the Contracting Division Chief for the Jacksonville District, U.S. Army Corps of Engineers. An affidavit from Ms. Tolle explaining her decision to issue the Presolicitation Notices is attached hereto as Exhibit 1.[1]

[1] As undersigned counsel stated at the November 15, 2007 hearing, counsel received the Court's order of November 13, 2007 by e-mail. That e-mail stated that the Court had set a hearing for November 15, 2007. However, counsel did not realize that a written order was linked to the e-mail and, therefore, did not realize that the Court had set a deadline of November 14, 2007 for the Government to respond in writing to plaintiff's motion. Accordingly, defendant is including with this submission a brief response to that part of the motion concerning the request that the United States be held in contempt.

As stated at the November 15, 2007 hearing, the four solicitations at issue here are not in violation of the Court's November 1, 2007 order. In that order, the Court ordered that the United States is enjoined "from using Solicitation No. W912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services." The Army Corps of Engineers ("Corps") has not proceeded with that solicitation. Rather, the Corps has taken four of the contracts included in the solicitation and indicated its intent to issue those contracts as stand-alone solicitations. These solicitations are significantly different from the solicitation that was the subject of the Court's November 1, 2007 order. Namely, unlike that solicitation, these are not indefinite delivery/indefinite quantity contracts. There are no task orders involved in any of these solicitations. Thus, the Corps has not issued "negotiated IDIQ contracts or task orders" in violation of the Court's order.[2]

Indeed, one of the primary concerns raised by the Court in the November 1, 2007 decision was that the original solicitation would render a significant number of dredging contracts immune from protest actions by contractors. That concern is alleviated by the four solicitations at issue here because none of these solicitations involves the issuance of task orders. As a result, it cannot be said that the Corps has violated the Court's order. Rather, through these four solicitations, the Corps has addressed what the Court indicated was a significant concern with the initial solicitation.

---

[2] Defendant recognizes that the Court has already permanently enjoined three of the solicitations from proceeding. Nonetheless, defendant reiterates its position that these solicitations are properly addressed in separate protest actions since, as set forth herein, they do not fall within the ambit of the Court's November 1, 2007 order. Moreover, the Corps has not violated any statute or regulation in these solicitations, and Weeks cannot demonstrate any prejudice as a result of the solicitations.

In addition, as noted at the November 15, 2007 hearing, defendant does not believe that Weeks will suffer any prejudice from these four solicitations, even under the standard adopted by the Court in the November 1, 2007 decision. In that decision, the Court held that the prejudice to Weeks from the initial solicitation was the fact that Weeks could not protest the various task orders. Here, as stated above, that prejudice is not present. Given this fact, it cannot be said that the four solicitations are unlawful. See, e.g., Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001) (When a protestor asserts a violation of a regulation or procedure, it must show that the violation is "clear and prejudicial.").[3]

Finally, as indicated in the attached affidavit, the contracting officer who issued the presolicitation notices did not believe that she was violating the Court's order. She consulted extensively with her supervisors at the Corps and with counsel at the Corps. Her decision cannot be said to have been made in bad faith. Indeed, Weeks has not, and cannot, cite any evidence to the contrary. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002) ("The presumption that government officials act in good faith is nothing new to our jurisprudence.").

Given the foregoing, defendant has not violated this Court's order. The Court should therefore deny plaintiff's motion to hold defendant in contempt.

[3] As demonstrated by the Determinations and Findings attached to Ms. Tolle's affidavit, the Corps also had a rational basis for proceeding with the four solicitations.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St., NW
Washington, D.C. 20530
Tele: (202) 305-3087
Fax: (202) 305-1571

November 16, 2007

Attorneys for Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 07-700C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF CYNTHIA S. TOLLE**

I, CYNTHIA S. TOLLE, of legal age, and a resident of Jacksonville, Florida, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Contracting Division Chief for the Jacksonville District, U.S. Army Corps of Engineers (the district or SAJ). I hold an unlimited contracting warrant.

2. Copies of the Court's November 1, 2007 order were distributed by the Department of Justice to counsel for the Corps at the district, at South Atlantic Division (SAD), at Headquarters, and to contracting personnel in SAD. I was on travel for official business from 1 – 9 November 2007, but nevertheless followed discussions with counsel at the Corps and the contracting command regarding the decision. Because the dredging work for two of the four "seed" projects, Kings Bay and Mayport had become critical due to the loss of time during the solicitation process while working through the protest issues, discussions ensued between myself, the SAD Regional Contracting Chief, and counsel at the Corps as to the next course of action to obtain this work.

3. Numerous discussions were held by counsel at the Corps and contracting personnel at the district, at SAD and at HQ on the scope of the Court's order and which contracting vehicle to use (Invitations for Bids (IFB), Requests for Proposals (RFPs) or

Sole Source contracts) to obtain this vital dredging work, especially for Kings Bay and Mayport. At no time was I advised by counsel at the Corps nor did I believe that the language in the Court's decision prevented me from issuing stand alone RFPs for the needed work.

4. As the Chief of the Contracting Division, I directed my staff to issue the synopsis of all four projects as RFPs (Kings Bay Solicitation No.W912EP-08-R-0004, Mayport Solicitation No.W912EP-08-R-0007, Captiva Solicitation No.W912EP-08-R-0006 and Volusia Solicitation No.W912EP-08-R-0005) and to document the rationale for issuance under stand alone RFP versus IFB. Although use of IFBs was also discussed as an option, the historical problems using IFBs and the unusual and compelling urgency to accomplish the work at Kings Bay drove the decision to issue a stand alone RFP for this project. The rationales for these decisions are reflected in the separate D&Fs prepared for each project, (an unsigned copy of the D&F for Kings Bay was provided to the Court at the November 15, 2007 hearing), which are attached hereto. The D&Fs are dated November 7, 2007, which is the date the decision and rationale to proceed with the four solicitations were finalized. The memoranda were signed and finalized with non-substantive changes on November 15, 2007.

5. I have never violated any order of any Court and did not believe I was violating the Court's November 1, 2007 order. I consulted with my contracting superiors and with counsel at the Corps prior to issuing these stand alone RFPs. No one indicated that issuance of these separate stand alone RFPs would violate the Court's injunction not to "use(ing) Solicitation No. W912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection

services." None of these stand alone RFPs is part of a MATOC, an IDIQ, or a task order, and the facts and circumstances mandated that the work be procured in the most timely and efficient method possible, in this case through an RFP. Had I believed or been advised by counsel at the Corps that issuing these stand alone RFPs might be considered a violation of the Court's November 1, 2007 order, I would never have issued them.

6. I have been a warranted contracting officer for the Department of Army for 10 years and have been in the contracting specialty field for 21 years. I have been Chief of the Contracting Division at SAJ for two years. I have been recognized by my Commanders numerous times (3 Commander's Awards, 1 Achievement Medal, nominated for Army Contracting Officer of the Year) in the course of my federal service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 16 November 2007.

Cynthia S. Tolle

Cynthia S. Tolle

STATE OF FLORIDA
COUNTY OF DUVAL

Sworn to (or affirmed) before me this 16th day of November, 2007, by Cynthia Tolle, and subscribed at the direction of and in the presence of Cynthia Tolle, and in the presence of these witnesses:

Karen L. Nick
Signature

Karen L. Nick
Name

Darlene Ainsworth
Signature

DARLENE AINSWORTH
Name

SE Sotherland
Notary Public - State of Florida

Notary Public State of Florida
S E Sotherland
My Commission DD618115
Expires 11/28/2010

Personally Known ✓ OR Produced Identification ________

CESAJ-CT-C 7 November 2007

MEMORANDUM FOR RECORD:

SUBJECT: Determination and Findings for Utilizing Negotiated Procurement Process for Maintenance Dredging, 46-Foot Project, Entrance Channel (Cut-1N), Kings Bay, Georgia and Fernandina Harbor, Nassau County, Florida

DETERMINATION

Based on the following, I hereby determine that subject solicitation should be solicited under FAR Part 15 and that FAR 6.401(a) does not apply.

FINDINGS

1. Project Background:

a. This project was originally advertised on 8 August 2007 as one of the four "seed" projects under solicitation W912EP-07-R-0007, Regional Indefinite Delivery Indefinite Quantity Multiple Award Task Order Contracts (MATOC) in Support of Dredging and Shore Protection Projects within the Boundaries of the South Atlantic Division. The Kings Bay project was to be awarded as a Task Order under Group 1, Coast Guard Certified Hopper Dredging Projects.

b. The proposal due date for the basic MATOC was 7 September 2007 with awards to be made approximately 30 days later. As a result of contractor questions and subsequent amendments to not only the basic MATOC solicitation but the plans & specifications for all four task order projects, the proposal due date was changed from 7 September 2007 to 26 September and later to 3 October 2007.

c. On 28 September 2007, Weeks Marine, Inc., filed a protest in the United States Court of Federal Claims. This protest challenged the U.S. Army Corps of Engineers, South Atlantic Division (SAD) decision to solicit proposals for maintenance dredging and shore protection projects using negotiated indefinite delivery indefinite quantity (IDIQ) multiple award task order contracts. Pending the outcome of this protest, the proposal due date for W912EP-07-R-0007 was temporarily postponed.

d. On 1 November 2007, Judge Thomas C. Wheeler issued his Opinion and Order, which concluded that the U.S. Army Corps of Engineers, South Atlantic Division, was ENJOINED from using Solicitation No. W912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services. This decision, however, did not preclude the use of stand-alone Request for Proposals (RFPs) to solicit dredging requirements.

2. Procurement history. This project is an annual requirement that previously was procured using sealed bid procedures in accordance with FAR Part 14. However, in recent years it has been increasingly difficult to obtain adequate competition as well as competitive prices using an Invitation for Bid (IFB) procedure. Following is a chronology of events outlining the problems encountered since 2005 when attempting to use a sealed bid environment to successfully accomplish this work.

a. W912EP-05-B-0026 was issued on 9 September 2005 for maintenance dredging of Kings Bay and Fernandina Harbor in Nassau County, FL. On 18 October 2005, bid opening was conducted and the Government received two bids, both of which were well outside an awardable range. The excessive pricing revolved around the cost of the base work which required that portion of the dredged material to be placed on the beach at Ft. Clinch. In fact, the prices submitted for the beach placement at Ft. Clinch were more than 160% above the IGE; however, the prices for the other non-beach placement work were within an awardable range. This precluded the Government from being able to successfully award a

contract and further jeopardized the Districts ability to execute the project timely. As funds were severely constrained, time was of the essence, and the large delta between the bids and the IGE, the Government determined it was not in the best interest of the Government to attempt to negotiate a lower price based on the current scope of work. A determination was made to de-scope the project and remove the beach placement in an effort to salvage some of the project work while still providing some benefits to the customer by accomplishing as much of the dredging as feasibly possible. It should be noted that as this was project was procured under FAR Part 14 an amendment could not be issued after receipt of bids; therefore, the solicitation had to be cancelled. Therefore, the Government elected to cancel the existing solicitation, de-scope the project, convert from a cubic yardage contract to a rental contract and re-advertise the requirement in an effort to complete the dredging within the EPA imposed environmental window. **Had this been solicited as a RFP under FAR Part 15, the Government would have had the flexibility to change the requirements (removing the beach placement portion of the work) and issue an amendment to the offerors who had not been eliminated from competition in accordance with FAR 15.206. In a follow-on requirement, solicitation number W912EP-06-B-0002 was issued for the new scope of work on 19 December 2005. On 18 January 2006, bid opening was conducted and only one bid was received. Although the bid was within the awardable range, a cost and price analysis was performed in order to determine and document that the price was fair and reasonable since there was no price competition. A market survey was performed to inquire as to why only one bid was received. Award was made to Bean Stuyvesant, LLC.

b. Solicitation number W912EP-06-B-0016 was issued on 8 August 2006 for maintenance dredging of Kings Bay and Fernandina Harbor in Nassau County, FL. On 24 October 2006, bid opening was conducted and the Government received only one bid which was substantially outside of an awardable range. The IGE was $5.6M and the bid received from Great Lakes Dredge & Dock was $10.4M. This project also contained the placement of sand on the beach at Ft. Clinch in the same manner as W912EP-05-B-0026 shown above. The Government encountered the same circumstances under this sealed bid environment and was forced to make the same determination to de-scope the project and remove the beach placement. In a follow-on requirement, solicitation number W912EP-07-B-0002 was issued for the new scope of work on 15 November 2006. On 15 December 2006, bid opening was conducted and three bids were received with prices ranging from as low as $1.7M to as high as $5.2M. The Independent Government Estimate was $3.3M. As the apparent low bidder's price was substantially below the IGE, the apparent low bidder was asked to verify his bid. After review and analysis, a contract was subsequently awarded to the low bidder, Manson Construction.

c. Solicitation number W912EP-07-B-0017 for the maintenance dredging of Kings Bay and Fernandina Harbor in Nassau County, FL was issued on 11 May 2007. On 3 July 2007, bid opening was conducted. It should be noted that prior to issuance of this solicitation, permission was received from SAD to solicit this project outside of the hopper dredge environmental window and to utilize a cutter-suction dredge. The reason that this permission was requested and granted, was because over the past two years the solicitation included the beach placement of sand in the winter dredging solicitation using a hopper dredge. This beach placement of sand from certain portions of the entrance channel is in accordance with a Memorandum of Understanding between the U.S. Navy and the city of Fernandina Beach. As stated above, under solicitations W912EP-05-B-0026 and W912EP-06-B-0016, prices submitted were outside of an awardable range. The excessive pricing seemed to revolve around the cost of beach placement of sand using a hopper dredge during the winter months. Only two bids were received for W912EP-07-B-0017, both of which were outside of the awardable range. The government performed market research as well as cost analysis and concluded that the independent government estimate (IGE) required revision which resulted in the Government's ability to make award to Great Lakes Dredge & Dock Company, LLC. During contract performance, however, there were several northeaster storms and one tropical storm in the vicinity which resulted in high wave action preventing the cutter-suction dredge from operating at full production. These unforeseen weather delays resulted in substantial payment of non-production hours to the contractor in accordance with the terms and conditions contained in the rental contract thus, supporting that use of equipment other than a hopper dredge during winter months did not produce the best results for the Government or our customer.

d. While researching these previous solicitations, it was noted that four of the last seven solicitations for this project have been awarded to Bean Stuyvesant. During a recent telephone conversation with Ancil Taylor of Stuyvesant Dredging, this office was informed that due to ongoing litigation between Bean Dredging and Stuyvesant Dredging, these firms would not be submitting bids or proposals for any Corps dredging projects in the near future. Mr. Taylor also stated that a significant portion of their plant and equipment was being sold to other dredging companies. Since Bean Stuyvesant has historically submitted the lowest bids on Kings Bay, this increases the possibility that a sealed bid procedure will once again result in prices outside the awardable range. Therefore, use of an RFP would allow the Government to open discussions, negotiate prices as well as other terms and conditions, and permit the issuance of an amendment after receipt of proposals in accordance with FAR 15.206.

3. Market Research:

a. There are only five dredging firms which own Coast Guard certified hopper dredges: B+B Dredging, Stuyvesant Dredging, Great Lakes Dredge & Dock, Manson Construction, and Weeks Marine. However, it is unlikely that Stuyvesant Dredging will be submitting any bids or proposals for dredging work in the near future due to the litigation and selling off of equipment as annotated above.

b. According to the latest Hopper Dredge Status Report, only four of these five dredging firms have Coast Guard certified hopper dredges which may be available to perform work on the Kings Bay project during the environmental window of 15 December to 15 March. In addition, one of these four firms is Stuyvesant Dredging. Therefore, it appears that only three potential offerors actually have Coast Guard certified hopper dredges which may be available to perform this work in the timeframe required.

4. Unusual and compelling urgency:

a. During the time period between the filing of the protest and the decision issued by Judge Wheeler, the Project Delivery Team (PDT) determined that the Kings Bay project was going to be adversely affected by this unforeseen delay. Therefore, an amendment (which would have been issued if the protest had been resolved in favor of the Corps) was prepared for the Kings Bay project shortening the timeframes for all pre- and post-award requirements as follows:

(1) Award would be made within 15 days instead of the usual 30 days.

(2) Bid bonds would be required within 5 days after award instead of the normal 10 days.

(3) All pre-construction submittals would be required within 5 or 10 days instead of the routine 15 or 20 days.

(4) The Notice to Proceed (NTP) would be issued within 15 calendar days after award instead of the usual 30 calendar days.

b. Following the judicial decision regarding the MATOC protest, the PDT members discussed the criteria for utilizing FAR 6.302-2, Unusual and Compelling Urgency. The following information was subsequently received from the Project Manager and the U.S. Naval Submarine Base:

(1) The Kings Bay Entrance Channel serves as the gateway to the Naval Submarine Base, Kings Bay. The Submarine Base is home to Submarine Group 10, Submarine Squadrons 16 and 20, Strategic Weapons Facility Atlantic and the Trident Training Facility. The sole mission of these Ohio Class Submarines is strategic deterrence. Strategic deterrence remains a fundamental element of the U.S. defense strategy. Nuclear powered submarines will be the principal component of the future U.S. strategic posture. Land based bombers and intercontinental missiles are being reduced; since the late 1990s the land based strategic forces consists of some 20 B-2 long-range bombers carrying stand-off attack missiles, each with only one warhead. The SSBN force is the only Triad element still deploying missiles armed with Multiple Independently targeted Re-entry Vehicles. The deployment schedules for

these submarines are classified and are varied to maintain secrecy. The maintenance of the Entrance Channel is integral to these deployment schedules. Shoaling within the channel can cause the submarines to run aground and cause a variety of security issues. If the submarines are forced to enter and exit the channel based on tide conditions, this becomes readily apparent and compromises their ability to maintain random schedules. This is the driving force in maintaining the Entrance Channel on an annual basis in this highly dynamic marine environment.

(2) Dredging must occur annually in this portion of the channel at Kings Bay in order to maintain the depths necessary for safe passage of the submarines that are home-ported here as well as submarines from other bases. The last dredging in this portion of the channel concluded in February of 2007. Delays in the award of this current contract will render the channel unsafe and unusable for its intended purpose if not dredged on an annual basis. Delays will also cause adverse scheduling impacts with respect to tidal considerations and environmental windows. Tidal factors have an influence on when dredging can occur. Conditions must be conducive for the safe operation of the dredge. In order to avoid unfavorable impacts to sea turtles, the dredging operations must be concluded prior to 15 March.

(3) Based on the risk to human health and life, the entrance channel dredging is conducted by a hopper dredge in accordance with the Safety Management Action Plan and the prohibitions imposed by higher authority. To allow other types of dredges to work on this project would require a waiver from SAD as shown above in paragraph 2.e. above. Also, environmental windows have been created by Resource Agencies in order to reduce the risk of endangering a variety of sea turtles within the area; hopper dredges are permitted to dredge only in the winter months for this reason. Due to the length of the channel and the duration involved with the maintenance of this channel, a contract award after the month of November seriously impacts the dredging contractor's ability to schedule, mobilize and commence work within the constraints of this environmental window.

(4) Failure to provide a timely response in this particular situation would have seriously harmed the U.S. Navy and its ability to fulfill its national defense mission. Therefore, the determination was made to procure this work under 10 USC 2304(c)(2), FAR 6.302-2, Unusual and Compelling Urgency.

5. Request for Proposal:

a. FAR 6.401(a) states that Contracting officers shall solicit sealed bids if --

(1) Time permits the solicitation, submission, and evaluation of sealed bids;
(2) The award will be made on the basis of price and other price-related factors;
(3) It is not necessary to conduct discussions with the responding offerors about their bids; and
(4) There is a reasonable expectation of receiving more than one sealed bid.

b. The following facts and determinations have been made regarding Kings Bay and FAR 6.401(a):

(1) Time has become a critical factor in the successful accomplishment of the Kings Bay project and is evidenced by the facts detailed above concerning Unusual and Compelling Urgency. The potential of receiving only one bid or receiving bids outside the awardable range is a historical fact as documented in the Procurement History paragraphs above. Due to the critical nature of this project, there will not be sufficient time to convert a sealed bid to a negotiated procurement and award a contract within the limited timeframe remaining; and therefore the successful performance of this project within the constraints of the environmental window would be jeopardized.

(2) Due to the potential that the low bidder in a sealed bid scenario would not have plant and equipment available to perform this work within the limited timeframe, it becomes essential that the Government consider non-price related factors, such as availability of proposed equipment. Although, FAR 9.104(b) provides the Government with the ability to consider performance schedule during the responsibility determination under a sealed bid scenario, the undisputed fact remains that the Government has historically found it difficult, in fact impossible, to determine a low bidder non-responsible on the grounds that their plant

was not available. Therefore, it is in the best interest of the Government to evaluate availability of equipment under an RFP.

(3) Based on the Procurement History provided in paragraph 3 above, the Government requires the ability to conduct discussions with offerors concerning their equipment availability, past performance, as well as price. This project would be severely impacted if these factors were not considered and the result would be detrimental to the United States Navy and to the national defense of the United States.

(4) Although according to the Hopper Dredge Status Report, there are three firms with available equipment to perform this work, the procurement history on this project indicates that competition is not always present. Additionally, the Hopper Dredge Status Report could currently show three dredges available when in actuality some may already be gainfully employed and not documented. Based on our past experience, there is a reasonable expectation that only one proposal will be received or all proposals will be outside the awardable range.

6. Based upon all the facts contained herein, it is in the Government's best interest to procure this work under FAR Part 15, Contracting by Negotiation.

Cynthia S. Tolle

CYNTHIA S. TOLLE
Contracting Officer
Chief, Contracting Division

CESAJ-CT-C 7 November 2007

MEMORANDUM FOR RECORD:

SUBJECT: Determination and Findings for Utilizing Negotiated Procurement Process for U. S. Naval Station, Mayport, Florida, Entrance Channel, Turning Basin, Destroyer Slip, Carrier Basin, and Pier C-2, Maintenance Dredging, 42-Foot Project.

## DETERMINATION

Based on the following, I hereby determine that subject solicitation should be solicited under FAR Part 15 and that FAR 6.401(a) does not apply.

## FINDINGS

1. Project Background:

a. This project was originally advertised on 8 August 2007 as one of the four task order projects under solicitation W912EP-07-R-0007, Regional Indefinite Delivery Indefinite Quantity Multiple Award Task Order Contracts (MATOC) in Support of Dredging and Shore Protection Projects within the Boundaries of the South Atlantic Division. The Mayport project was to be awarded as a task order under Group 4, Additional Projects (not included in Groups 1, 2, or 3).

b. The proposal due date for the basic MATOC was 7 September 2007 with awards to be made approximately 30 days later. As a result of contractor questions and subsequent amendments to not only the basic MATOC solicitation but the plans & specifications for all four task orders, the proposal due date was changed from 7 September 2007 to 26 September and later to 3 October 2007.

c. On 28 September 2007, Weeks Marine, Inc. filed a protest in the United States Court of Federal Claims. This protest challenged the U.S. Army Corps of Engineers, South Atlantic Division (SAD) decision to solicit proposals for maintenance dredging and shore protection projects using negotiated indefinite delivery indefinite quantity (IDIQ) multiple award task order contracts. Pending the outcome of this protest, the proposal due date for W912EP-07-R-0007 was temporarily postponed.

d. On 1 November 2007, Judge Thomas C. Wheeler issued his Opinion and Order, which concluded that the U.S. Army Corps of Engineers, South Atlantic Division, was ENJOINED from using Solicitation No. W912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services. This decision, however, did not preclude the use of stand-alone Request for Proposal (RFP) to solicit dredging requirements.

2. Procurement history: This project is procured every three years using sealed bid procedures in accordance with FAR Part 14. The most recent contract for this work was issued against W912EP-05-B-0019 on 8 July 2005 for Maintenance Dredging of Entrance Channel, Turning Basin, Destroyer Slip East, Carrier Basin and Pier C-2, 42-Foot Project, and Construction Dredging, Destroyer Slip West, 35-Foot Project, Mayport Harbor, Florida. On 09 August 2005, bid opening was conducted and the Government received five bids. The job consisted of maintenance dredging from the Entrance Channel with disposal occurring in the Jacksonville Harbor Ocean Disposal Area and dredging occurring in the Destroyer Slip and Turning Basin to be disposed of in an upland disposal area located on the Mayport Naval Base. The Contractor failed to mobilize timely, which resulted in a Cure notice being issued on 03 February 2006. Unfortunately, due to the negligence of the contractor the Corps of Engineers had to request an extension to the environmental window in hopes that the extension would result in completion of the project. The extension was granted but, caused the Government to lose usage of the project for 4 months. The contractor was given a "marginal" rating on their past performance for their failure to mobilize timely and jeopardizing the successful execution of the project. Though termination for default could have been issued, the Government determined that to terminate a project that must be dredged during tight environmental windows would result in a greater risk to the Government and would probably

not result in completion of the project. The Government discussed in house the need to solicit under requests for proposals and the need to review equipment availability, capability and the contractor's past performance to determine performance risk on projects under tight environmental windows. This would provide a greater level of confidence in successful completion and would not leave the Government in a situation where they may or may not receive approval for a short extension to the environmental windows.

3. Request for Proposal:

a. FAR 6.401(a) states that Contracting officers shall solicit sealed bids if --

(1) Time permits the solicitation, submission, and evaluation of sealed bids;
(2) The award will be made on the basis of price and other price-related factors;
(3) It is not necessary to conduct discussions with the responding offers about their bids; and
(4) There is a reasonable expectation of receiving more than one sealed bids.

b. Because of the problems associated with this contract in the past as denoted in paragraph 2 above, it is clear that the Government must have the ability to review the contractor's plant and equipment availability to assure the work can be performed in accordance with the contract schedule. Additionally, to further reduce the performance risk to the Government, past performance must be reviewed as required in FAR Part 15 to assure a high level of confidence that the contractor consistently delivers on their contracts as the Government cannot afford to face non-execution due to non-performance. The Government must be prepared to execute this project on-time and not count on extensions to the environmental windows when the failure to perform is solely due to the contractor's failure to pursue the job diligently. Therefore, it is the recommendation of the contract specialist that award of this project and future solicitations on this project must be awarded on factors other than price alone and discussions may well be necessary to ensure the Government's confidence in the offerors ability to have equipment available along with supporting past performance information that will ensure a low performance risk to the Government in the selection of that contractor.

4. Based upon all the facts contained herein, it is the recommendation of the contract specialist that the Contracting Officer determine that it is in the Government's best interest to procure this work under FAR Part 15, Contracting by Negotiation.

Cynthia S. Tolle

CYNTHIA S. TOLLE
Contracting Officer
Chief, Jacksonville Regional Contracting Center

PREPARED BY:

VERONICA TAYLOR
Contract Specialist

CESAJ-CT-C 7 November 2007

MEMORANDUM FOR RECORD:

SUBJECT: Determination and Findings for Utilizing Negotiated Procurement Process for Maintenance Dredging and Advance Maintenance Dredging, Intracoastal Waterway, Jacksonville to Miami, Florida, 12-Foot Project, Cut-V22 through Cut V-36, Volusia County, Florida, W912EP-08-R-0005

DETERMINATION

Based on the following, I hereby determine that subject solicitation should be solicited under FAR Part 15 and that the conditions in FAR 6.401(a) do not apply.

FINDINGS

1. Project Background:

a. This project was originally advertised on 8 August 2007 as one of the four "seed" projects under solicitation W912EP-07-R-0007, Regional Indefinite Delivery Indefinite Quantity Multiple Award Task Order Contracts (MATOC) in Support of Dredging and Shore Protection Projects within the Boundaries of the South Atlantic Division. The Volusia project was to be awarded as a task order under Group 2, Small Business Set Aside Projects.

b. The proposal due date for the basic MATOC was 7 September 2007 with awards to be made approximately 30 days later. As a result of contractor questions and subsequent amendments to not only the basic MATOC solicitation but the plans & specifications for all four task order projects, the proposal due date was changed from 7 September 2007 to 26 September and later to 3 October 2007.

c. On 28 September 2007, Weeks Marine, Inc., filed a protest in the United States Court of Federal Claims. This protest challenged the U.S. Army Corps of Engineers, South Atlantic Division (SAD) decision to solicit proposals for maintenance dredging and shore protection projects using negotiated indefinite delivery indefinite quantity (IDIQ) multiple award task order contracts. Pending the outcome of this protest, the proposal due date for W912EP-07-R-0007 was temporarily postponed.

d. On 1 November 2007, Judge Thomas C. Wheeler issued his Opinion and Order, which concluded that the U.S. Army Corps of Engineers, South Atlantic Division, was ENJOINED from using Solicitation No. W912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services. This decision, however, did not preclude the use of stand-alone Request for Proposal (RFP) to solicit dredging requirements.

2. Procurement history. This project is an annual requirement that previously was procured using sealed bid procedures in accordance with FAR Part 14. A trend has shown it increasingly difficult to obtain adequate competition as well as competitive prices using an Invitation for Bid (IFB) procedures. Additionally, this project has a special and unique requirement which necessitates a closer look at the contractor's demonstrated experience and means and methods as discussed below.

a. The current project, W912EP-08-R-0005, Maintenance Dredging and Advance Maintenance Dredging, Intracoastal Waterway, Jacksonville to Miami, Florida, 12-Foot Project, Cut-V22 through Cut V-36, Volusia County, Florida, includes an unusual requirement for placing the pipeline through an enclosed culvert in order to place sand on New Smyrna beach. This procedure is considered highly risky and the opportunity for damage to the environment is great if a spill occurs. Because of the risk associated with the placement of pipe in the enclosed culvert, the Government needs to review the contractors work plan associated with

accomplishing this unusual task as well as any demonstrated experience showing where the contractor has successfully placed pipeline which runs through an enclosed culvert (or similar structure) along with their past performance which would directly relate to the performance risk associated with the contractor's capability of successfully executing similar projects in the past.

b. Historically, in projects similar to Volusia the Government has encountered problems with the mishandling of pipelines which resulted in environmental spills. Contract number W912EP-05-C-0028 was solicited using sealed bid procedures and resulted in an award to Dredge Enterprises on 30 June 05 for Maintenance Dredging of St. Johns and Duval Counties. On 31 August 2006, the field representative was informed that the pipeline running between the dredge "Enterprise" and one of the upland disposal sites developed a split in the top of the pipe. This resulted in water and dredged material being sprayed onto adjacent condominiums which caused significant damage to the existing residences. In addition to the damage inflicted on the homes, material was also released into the marsh area adjacent to the condominiums causing great damage to an area identified as a "pristine environmental" section. On 6 October 2006, another incident of an environmental spill was reported. The field office reported that while the contractor was removing a steel discharge pipeline, a 500 foot long section rolled down the dike embankment and flattened the end of the weir outlet pipe causing a spill of 53,000 cubic yards over 29 acres impacting part of the green conservation areas. This incident is estimated at over $5 million dollars in damage and will have to be mitigated in an effort to improve or restore the area back to its original condition. The need to review solicitations of this nature under a Request for Proposal (RFP) scenario would provide the Government an opportunity to evaluate the contractor's demonstrated experience when laying pipeline in environmentally sensitive areas as well as review their means and methods for performing this work.

3. Request for Proposal:

a. FAR 6.401(a) states that Contracting officers shall solicit sealed bids if --

(1) Time permits the solicitation, submission, and evaluation of sealed bids;
(2) The award will be made on the basis of price and other price-related factors;
(3) It is not necessary to conduct discussions with the responding offerors about their bids; and
(4) There is a reasonable expectation of receiving more than one sealed bid.

b. Because of the unique requirement to place the pipeline through an enclosed area and the problem encountered previously on a project similar to the solicitation at hand, it is necessary that the Government have the ability to review the contractor's demonstrated experience in placing and handling pipe in unusual areas to ensure successful execution. Additionally, to further reduce the performance risk to the Government, past performance must be reviewed as required in FAR Part 15 to assure a high level of confidence that the contractor consistently delivers on their contracts as the Government cannot afford to face non-execution due to non-performance. Therefore, it is the opinion of the contract specialist that award of this project and future solicitations on this project must be awarded on factors other than price alone and discussions may well be necessary to ensure the Government's confidence in the offerors ability to successfully execute the project.

4. Based upon all the facts contained herein, it is the recommendation of the contract specialist that the Contracting Officer determine that it is in the Government's best interest to procure this work under FAR Part 15, contracting by Negotiation.

Cynthia S. Tolle

CYNTHIA S. TOLLE
Contracting Officer
Chief, Jacksonville Regional Contracting Center

PREPARED BY:

KARLA M. GARCIA
Contract Specialist

CESAJ-CT-C 7 November 2007

MEMORANDUM FOR RECORD:

SUBJECT: Determination and Findings for Utilizing Negotiated Procurement Process for Captiva Island, Beach Renourishment Project, Lee County, Florida W912EP-08-R-0006

DETERMINATION

Based on the following, I hereby determine that subject solicitation should be solicited under FAR Part 15 and that the conditions in FAR 6.401(a) do not apply.

FINDINGS

1. Project Background:

a. This project was originally advertised on 8 August 2007 as one of the four "seed" projects under solicitation W912EP-07-R-0007, Regional Indefinite Delivery Indefinite Quantity Multiple Award Task Order Contracts (MATOC) in Support of Dredging and Shore Protection Projects within the Boundaries of the South Atlantic Division. The Captiva project was to be awarded as a task order under Group 3, Contracts in Support of Dredging and Shore Protection Projects within the boundaries of South Atlantic Division.

b. The proposal due date for the basic MATOC was 7 September 2007 with awards to be made approximately 30 days later. As a result of contractor questions and subsequent amendments to not only the basic MATOC solicitation but the plans & specifications for all four task orders, the proposal due date was changed from 7 September 2007 to 26 September and later to 3 October 2007.

c. On 28 September 2007, Weeks Marine, Inc., filed a protest in the United States Court of Federal Claims. This protest challenged the U.S. Army Corps of Engineers, South Atlantic Division (SAD) decision to solicit proposals for maintenance dredging and shore protection projects using negotiated indefinite delivery indefinite quantity (IDIQ) multiple award task order contracts. Pending the outcome of this protest, the proposal due date for W912EP-07-R-0007 was temporarily postponed.

d. On 1 November 2007, Judge Thomas C. Wheeler issued his Opinion and Order, which concluded that the U.S. Army Corps of Engineers, South Atlantic Division, was ENJOINED from using Solicitation No. W912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services. This decision, however, did not preclude the use of stand-alone Request for Proposals (RFPs) to solicit dredging requirements.

2. Procurement history. Shore Protection projects such as this are repeat requirements that previously were procured using sealed bid procedures in accordance with FAR Part 14. However, in recent years when projects on the Gulf Coast have been awarded, the capability of the equipment to perform the work have become factors in failed performance and delivery of completed projects in a satisfactory manner as discussed below.

a. W912EP-05-B-0010 was issued on 29 November 2004 for Manatee County Shore Protection Project, Anna Maria Island, Manatee County, Florida as an unrestricted solicitation. On 17 May 2005, bid opening was conducted and the Government received five bids, all outside of the awardable range. As is common practice, the Contracting Officer immediately requested that the Cost Engineer review and revise (if deemed appropriate) the Independent Government Estimate (IGE). In the requested review, the IGE was determined to need revision and was subsequently adjusted to consider conditions that had not been considered in the original estimate. After revision, the apparent low bidder's bid was deemed within an awardable range. The contractor received the award and offered up equipment that was considered acceptable to work in the area. Unfortunately, due to high wave action, sea conditions and

weather (normal for this area during this time period), the contractor was not able to successfully dredge the area with the equipment they elected to use as the dredge was unable to withstand high wave action above 3', the dredge continually broke down, and the production levels were low. As the dredge continued to experience difficulties with the waves and operability it became apparent that the contractor would not complete the work on time. As a very active hurricane season hit the coasts of Florida, the contractor elected to seek safe harbor and arbitrarily decided not to return to the site. Numerous discussions back and forth with the contractor resulted in the contractor not remobilizing and the Government attempting to salvage the project elected to approach EPA and request a new permit that would allow the contractor to commence dredging at a later date. This attempt was made based on direction from the Division that this project must be completed and termination for cause was not considered a viable option. Finally a new permit was received but, unfortunately dredging outside the hurricane season did not result in any better execution and the contractor failed to complete the project prior to close of the environmental window. Discussions followed after the failed attempt amongst contracting and the decision was made that future dredging jobs in this area should be solicited under FAR Part 15 so the Government could consider equipment capability when dredging in rough sea conditions as well as demonstrated experience to show the vessel offered to perform the job had successfully executed in these conditions previously.

b. W912EP-07-B-0019, Maintenance Dredging, 32-Foot Project Alafia River Entrance Channel and Turning Basin, Tampa Harbor, Hillsborough County, Florida was issued on 14 June 2007 and advertised as a 100% Small Business Set-aside. On 31 July 2007, bid opening was conducted and three bids were received. All bids received were considerably lower than the Independent Government Estimate (IGE) with the apparent low bidder's bid falling 55 percent lower than the IGE. Following regulations, the Government requested the contractor to verify his bid. The Contractor verified his bid and acknowledged full understanding of the scope of the project, to include environmental concerns expressed in the solicitation. Currently, the contractor is late mobilizing to the site because the method and equipment he based his bid on is not capable of performing the work with the current water levels experienced at Lake Okeechobee (which was identified in the project plans/specifications). As the contractor has indicated that unless the lake levels reach at least 6 feet, he will be unable to begin the work successful project execution looks doubtful at this time which will probably result in a termination for cause.

3 Request for Proposal:

a. FAR 6.401(a) states that Contracting officers shall solicit sealed bids if --

(1) Time permits the solicitation, submission, and evaluation of sealed bids;
(2) The award will be made on the basis of price and other price-related factors;
(3) It is not necessary to conduct discussions with the responding offerors about their bids; and
(4) There is a reasonable expectation of receiving more than one sealed bid.

b. Because of the problems associated with contracts of this nature in the past as denoted in paragraph 2 (a) and (b) above, it is clear that the Government must have the ability to review the contractor's plant capability, consider sea and weather conditions in the areas where we have historically encountered problems, as well as environmental conditions that must be addressed to ensure successful execution. Additionally, to further reduce the performance risk to the Government, past performance must be reviewed as required in FAR Part 15 to assure a high level of confidence that the contractor consistently delivers on their contracts as the Government cannot afford to face non-execution due to non-performance. As Captiva is an area where rough sea and weather conditions are often encountered, it is in the government's best interest to procure under FAR Part 15 to ensure the contractor's equipment is capable of performing in areas where high wave action is encountered as well as look at demonstrated experience which will support their ability to successfully work in these areas with the equipment proposed. Therefore, it is the opinion of the Contracting Officer that award of this project and future solicitations on this project must be awarded on factors other than price alone and discussions may well be necessary to ensure the Government's confidence in the offerors ability to successfully execute the project.

4. Based upon all the facts contained herein, it is the recommendation of the contract specialist that the Contracting Officer determine that it is in the Government's best interest to procure this work under FAR Part 15, Contracting by Negotiation.

Cynthia S. Tolle

CYNTHIA S. TOLLE
Contracting Officer
Chief, Jacksonville Regional Contracting Center

PREPARED BY:

WILLIE ANN MAYS
Contract Specialist

**CERTIFICATE OF FILING**

I hereby certify that on the 16th day of November, 2007, a copy of the foregoing "DEFENDANT'S SUBMISSION AS ORDERED AT THE NOVEMBER 15, 2007 HEARING AND OPPOSITION TO PLAINTIFF'S REQUEST FOR AN ORDER TO SHOW CAUSE AS TO WHY THE DEFENDANT SHOULD NOT BE FOUND TO BE IN CONTEMPT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/L. Misha Preheim